**In re WOODSIDE GROUP, LLC, et al., Debtors.**

**Official Committee of Unsecured Creditors, on behalf of the Estate of Woodside Group, LLC, et al., Plaintiff,**

**v.**

**Ezra K. Nilson, et al., Defendants.**

**Bankruptcy No. 6:08–bk–20682–PC.**
**Adversary No. 6:09–ap–01453–PC.**

United States Bankruptcy Court,
C.D. California,
Riverside Division.

Jan. 22, 2010.

Donald L. Gaffney, Esq., Don Bivens, Esq., Snell & Wilmer, L.L.P., Phoenix, AZ, Eric S. Pezold, Esq., Snell & Wilmer, L.L.P., Costa Mesa, CA, Attorney for Plaintiff, Official Committee of Unsecured Creditors.

Tony Castanares, Esq., Stephan M. Ray, Esq., Lauren N. Gans, Esq., Stutman, Treister & Glatt, P.C., Los Angeles, CA, Mark F. James, Esq., Gary A. Dodge, Esq., Hatch, James & Dodge, Salt Lake City, UT, Attorneys for Defendants Ezra K. Nilson, et al.

Evan C. Borges, Esq., Irella & Manella, LLP, Newport Beach, CA, Attorneys for Defendants David Crockett, Abby Crockett, Seth Ure & Brett Ure.

## MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

Plaintiff, Official Committee of Unsecured Creditors, on behalf of the Estate of Woodside Group, LLC, *et al.* (the "Committee") seeks a preliminary injunction restricting the use and disposition of approximately $110 million in tax refunds either received or to be received by the Defendants, Ezra K. Nilson, Leicha B. Nilson, the Jessica Nilson Trust, the Nellie Jo Nilson Trust, the Brett Nilson Trust, the Abby Nilson Trust, the Joy Nilson Trust, the Benjamin Ezra Nilson Trust, Jessica Nilson, Nellie Jo Nilson, Brett Ure (f/k/a Brett Nilson), Abby Crockett (f/k/a Abby Nilson), Joy Nilson, Benjamin Ezra Nilson, Seth Ure, David Crockett, Andrew B. Hayworth, Nathan W. Pugsley, Bart Nilson, Kathy Nilson, Elizabeth Baker, Douglas Baker, Jason Reese Baker, Blake Jonas Baker, Rex James Baker, Leonard K. Arave, the Jill Arave Trust, the Matthew Len Arave Trust, the Christopher Brian Arave Trust, Jill Call–Arave (f/k/a Jill Arave), Matthew Len Arave, Christopher Brian Arave, Michael Cosgrave, Wayne R. Farnsworth, and Scott Nelson (collectively, the "Defendants") pending an adjudication of the merits of the Committee's causes of action in this adversary proceeding.

At the hearing, Donald L. Gaffney, Don Bivens, and Eric S. Pezold appeared for the Committee. Tony Castanares, Stephan M. Ray, and Lauren N. Gans appeared for Defendants, Ezra K. Nilson ("Nilson"), Leicha B. Nilson, Leonard K. Arave ("Arave"), Nathan W. Pugsley ("Pugsley"), Nelle Pugsley, Andrew B. Haywood ("Haywood"), Joy Haywood, Michael Cosgrave, Jessica Cosgrave ("Cosgrave"), Scott Nelson ("Nelson"), Benjamin Ezra Nilson, Jill Call–Arave, Matthew Len Arave, Christopher Brian Arave, and the Benjamin Ezra Nilson (the "Nilson Defendants"). Evan C. Borges appeared for Defendants, David Crockett ("Crockett") and Abby Crockett and Defendants, Seth Ure ("Ure") and Brett Ure. The court, having considered the pleadings, evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law[1] pursuant to F.R.Civ.P. 52(a)(1), as incorporated into FRBP 7052.[2]

---

1. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such.

2. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 after its amendment by the Bankruptcy Abuse Prevention and Consumer Protection Act of

## I. STATEMENT OF FACTS

### A. *The Woodside Entities*

Woodside Group, LLC ("Woodside Group") and its affiliates and subsidiaries (the "Woodside Entities") operate one of largest privately held homebuilding companies in the nation. Woodside Group is the parent company of multiple subsidiaries. Through approximately 188 of those subsidiaries (the "Restricted Subsidiaries"), Woodside Group engages in real estate development and residential construction in eight states. While the Restricted Subsidiaries have significant homebuilding operations in Nevada, Arizona, Utah, Minnesota, Florida, Maryland, and Texas, approximately 42% of the Restricted Subsidiaries' homebuilding revenues are derived from operations in California. The operations of Woodside Group are financed through Woodside Group's affiliate, Pleasant Hill Investments, LC ("PHI").

Woodside Group also has subsidiaries engaged in business activities outside its homebuilding operations (the "Unrestricted Subsidiaries").[3] The Unrestricted Subsidiaries purchase land from third parties, hold real estate, obtain zoning and other entitlements on long-term projects, reinsure the Restricted Subsidiaries, invest in joint venture projects with other homebuilders, perform renovation work on government facilities, and sell land to the Restricted Subsidiaries at market prices.

Woodside Group provides certain administrative functions for its subsidiaries including cash management, employee benefits, managerial assistance, accounting, financial, planning, and insurance review. In exchange for these services, the subsidiaries pay Woodside Group an administrative fee.

Woodside Group was profitable for nearly 30 years. Between 2002 and 2006, Woodside Group outperformed its competitors with respect to EBITDA margins by an average of between 5% and 9%. Woodside Group's KPMG-audited financial statements for December 31, 2006, showed assets of $1,892,664,000, liabilities of $1,059,333,000, and total equity of $824,211,000. Beginning in 2007, however, Woodside Group's operations were stressed by a deterioration in real estate market conditions, a significant decline in home prices, a lack of residential mortgage loans, and a consistently high inventory of existing homes. Still, the Woodside Entities generated revenues exceeding $1 billion during 2007. At the close of 2007, Woodside Group's KPMG audits showed assets of $1,503,108,000, liabilities of $1,054,043,000, and equity of $438,400,000. On the date of the order for relief, the Woodside Entities had approximately $70 million in cash and employed approximately 494 employees.

### B. *Ownership & Management*

Nilson, Woodside Group's Chairman and Chief Executive Officer, founded Woodside Group in 1977. Nelson is Woodside Group's Chief Operations Officer, and Arave serves as Woodside Group's Chief Financial Officer. Nilson, Nelson, and Arave also constitute Woodside Group's Board of Directors. Approximately 95%

2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P.").

**3.** The Unrestricted Subsidiaries are Liberty Holdings Group, LLC, Alameda Investments, LLC, JSO Land, LLC, Eagleridge Office Park, LLC, Wheatland Heritage Oaks, LLC, Hillsborough, LLC, WDS MTG, LLC, Atherton Construction, LLC, Victory Holdings, LLC, Danville Land Investments, LLC, Bellvue Holdings, LLC, Walnut Creek Development, LLC, WSD SE1, LLC, WMI Holdings, LLC, and Reliant Structural Warranty Insurance Company, Inc.

of the equity in Woodside Group is owned by Nilson, Nelson, and Arave (the "senior management"), and members of the Nilson family, either individually or in trust.

## C. Debt Structure

### 1. JPMorgan Chase Loan Agreement

On May 5, 2006, JPMorgan Chase Bank, N.A. ("JPMorgan Chase"), as administrative agent for JPMorgan Chase Bank, N.A., Bank of America, N.A., U.S. Bank National Association, Washington Mutual Bank, Wachovia Bank, National Association, Bank of the West, Guaranty Bank, Union Bank of California, N.A., First Commercial Bank, New York Agency, Suntrust Bank, Comerica Bank, AmSouth Bank, Compass Bank, and Wells Fargo Bank, National Association (the "Bank Group") and PHI executed a Credit Agreement (the "Credit Agreement") dated May 5, 2006, under the terms of which the Bank Group agreed to make a revolving unsecured line of credit to PHI in the maximum principal amount of $620,000,000 (the "Revolving Loan"). In conjunction therewith, Woodside Group and each of the Restricted Subsidiaries executed and delivered to JPMorgan Chase a Repayment Guaranty dated May 5, 2006, unconditionally guarantying payment of the amounts due under the Credit Agreement. Under the terms of the Credit Agreement, PHI was permitted to borrow money from the Bank Group pursuant to a borrowing base calculation, i.e., the outstanding amount of the Revolving Loan could not exceed the value of a pool of land and housing assets held by the Restricted Subsidiaries (the "Borrowing Base") minus other indebtedness of Woodside Group, PHI, and the Restricted Subsidiaries, as calculated pursuant to § 2.20 of the Credit Agreement.

On May 5, 2006, Nilson, Nelson, Arave, the Jessica Nilson Trust, the Joy Nilson Trust, the Benjamin Ezra Nilson Trust, the Brett Nilson Trust, the Abby Nilson Trust, the Nellie Jo Nilson Trust, Victory Holdings, Inc., Reliance Structural Warranty Insurance Company, Inc., Atherton Construction, Inc., Alameda Investments, LLC, Hillsborough Corporation, and Wasatch Pacific Investments, LLC (the "Subordinated Lenders"), executed and delivered to JPMorgan Chase a Continuing Subordination and Standstill Agreement dated May 5, 2006 (the "Subordination Agreement"), under the terms of which the Subordinated Lenders subordinated their claims against Woodside Group, PHI, and each of the subsidiaries and affiliates listed in Exhibit A to the Subordination Agreement (the "Borrowing Group") to the payment of amounts due under the Credit Agreement. The Borrowing Group was permitted to make distributions to the Subordinated Lenders (the "Permitted Payments") under the Subordination Agreement,[4] but only if no default existed

---

4. Section 2 of the Subordination Agreement entitled "Restriction of Payment of Subordinated Debt, Disposition of Payments Received by Subordinated Lender," states:

The members of the Borrowing Group will not make, and Subordinated Lender will not accept or receive, any payment or benefit in cash or otherwise (or exercise any right of, or permit any set-off with respect to, the Subordinated Debt), directly or indirectly, on account of any amounts owing on the Subordinated Debt, provided, however, the members of the Borrowing Group may make, and the Subordinated Lender may accept, Permitted Payments (hereinafter defined), if and only if at the time of each Permitted Payment and both before and after giving effect thereto (a) no Default or Event of Default under the Senior Credit Agreement shall have occurred and be continuing, and (b) the members of the Borrowing Group will remain in compliance with the covenants set forth in Section 5.3 of the Senior Credit Agreement. As used herein a "Permitted Payment" means (i) payments of accrued interest owing on the Subordinated Debt and (ii) payments (including prepayments) of principal, in each case solely out of monies which the mem-

or had occurred under the Credit Agreement.[5] As of March 31, 2008, approximately $314 million in principal was outstanding under the Credit Agreement.

### 2. *Noteholder Debt*

The operations of Woodside Group were also financed through capital raised by PHI under the terms of four Note Purchase Agreements dated September 16, 2003, May 25, 2004, July 7, 2005, and March 28, 2006 (the "Noteholder Debt"). The Noteholder Debt is owed to Metropolitan Life Insurance Company, Security Life of Denver Insurance Company, AXA Equitable Life Insurance Company, John Hancock Life Insurance Company, and New York Life Insurance Company (the "Noteholder Group"). PHI's obligations on account of the Noteholder Debt are unsecured, but are guaranteed by Woodside Group and the Restricted Subsidiar-

ies. As of March 31, 2008, approximately $372 million in principal was owed on the Noteholder Debt.

### 3. *Zion's Credit Facility*

The Unrestricted Subsidiaries were not borrowers or guarantors of either the debt owing to the Bank Group or the Noteholder Group. However, the operations of certain Unrestricted Subsidiaries—Victory Holdings, LLC; Atherton Construction, LLC; Walnut Creek Development, LLC; and Danville Investments, LLC (the "Zions Borrowers")—were funded by a $130 million revolving line of credit facility provided by Zions First National Bank ("Zions"). The Zions credit facility was guaranteed by two entities affiliated with Woodside Group: Wasatch Pacific Investments, LLC and Victory Land Investments, LLC (the "Zions Guarantors").

---

bers of the Borrowing Group are otherwise entitled to distribute to their respective members, partners or shareholders pursuant to *Section 6.6* of the Senior Credit Agreement. The members of the Borrowing Group agree that each Permitted Payment made to the Subordinated Lender shall reduce dollar for dollar the amount available for distribution to members, partners and shareholders of the members of the Borrowing Group pursuant to *Section 6.6.*

Ex. 2, at 3 (emphasis in original).

5. Section 6.6 of the Credit Agreement entitled *"Restricted Payments,"* states:

The members of the Borrowing Group will not, and will not permit any of their respective Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except (a) each member of the Borrowing Group may declare and pay dividends with respect to its Equity Interests payable solely in additional shares of its common stock, (b) Unrestricted Subsidiaries may declare and pay dividends ratable with respect to their Equity Interests, (c) each member of the Borrowing Group may make Restricted Payments

pursuant to and in accordance with stock option plans or other benefit plans for management or employees of the members of the Borrowing Group, except as would otherwise cause a Change in Control, and (d) each member of the Borrowing Group may make Restricted Payments to the owners of Equity Interests in such member, so long as both before and after giving effect to each such distribution no Default or Event of Default shall occur and the members of the Borrowing Group shall continue to be in compliance with all of the financial covenants set forth in *Section 5.3.*

Ex. 1, at 64 (emphasis in original). *"Restricted Payment,"* as defined in § 1.1 of the Credit Agreement, "means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in a member of the Borrowing Group, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such Equity Interests in such member of the Borrowing Group or any option, warrant or other right to acquire any such Equity Interests in such Person". Ex. 1, at 20 (emphasis in original).

### D. *Default Under JPMorgan Chase's Credit Agreement & The Noteholder Debt*

Section 5.1.6 of the Credit Agreement required PHI to execute and deliver to JPMorgan Chase a monthly statement certifying the value of the borrowing base, as calculated pursuant to § 2.20 of the Credit Agreement, as of the end of the preceding month (the "Borrowing Base Certificate"). In certifying the amount of the borrowing base, the value that PHI was permitted to attribute to Entitled Land, Lots Under Development, and Finished Lots, according to § 2.20.9(a) of the Credit Agreement, could not exceed 60% of the entire borrowing base at the time of determination. However, PHI's monthly Borrowing Base Certificates submitted to JPMorgan Chase consistently failed to properly account for this 60% limitation in violation of § 2.20.9(a) of the Credit Agreement. PHI's mischaracterization of the borrowing base continued through February 2007, when it tendered a Borrowing Base Certificate to JPMorgan Chase reporting a borrowing base of $748,277,046 for the period ending January 31, 2007, when, in fact, the borrowing base was only $633,006,520. By then, PHI was overdrawn by $78,487,921 and, therefore, the Borrowing Group was in default under § 6.1(a) of the Credit Agreement.

PHI was also required to tender to JPMorgan Chase a Compliance Certificate for Pleasant Hill Investments, LC (the "Compliance Certificate") every calendar quarter pursuant to the Credit Agreement. Arave signed and sent Compliance Certificates to JPMorgan Chase on behalf of PHI for the quarters ending December 31, 2006, March 31, 2007, June 30, 2007, and September 30, 2007, certifying that PHI, Woodside Group, and the Restricted Subsidiaries were in full compliance with all financial covenants and reporting requirements under the Credit Agreement, and that no default or event of default had occurred or was continuing.[6] By virtue of PHI's ongoing violation of the 60% limitation contained in § 2.20.9(a) of the Credit Agreement, PHI's representations in the Compliance Certificates created a further event of default under § 7.1.3 of the Credit Agreement.[7]

When the Borrowing Group's default continued through October 24, 2007, JPMorgan Chase and the Borrowing Group executed a Forbearance Agreement dated October 24, 2007, under the terms of which the Borrowing Group acknowledged that it had "failed to comply with the covenants required under Sections 2.20.9(a) and 6.1(a) of the Credit Agreement," that such acts or omissions were "Defaults or Events of Default under the Credit Agreement," and that by virtue of such existing defaults the Bank Group was "entitled to, among other things, to enforce their rights and remedies under the Credit Agreement and otherwise at law or in equity, including, without limitation, the right to terminate the Commitments and

---

6. Ex. 27.

7. Section 7.1.3 of the Credit Agreement entitled *"Representations and Warranties,"* states:

Any representation or warranty made or deemed made by or on behalf of a member of the Borrowing Group or any Restricted Subsidiary in or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been materially incorrect when made or deemed made.

Ex. 1, at 68. Arave testified that he made the representations in each Compliance Certificate notwithstanding the fact that he had done nothing to determine if the borrowing base complied with the 60% limitation contained in § 2.20.9(a) of the Credit Agreement. Ex. 194, at 173:8–174:9.

accelerate the Obligations." [8] However, JPMorgan Chase agreed to forbear from enforcing its rights and remedies until November 19, 2007. On December 19, 2007, JPMorgan Chase and the Borrowing Group executed a Second Forbearance Agreement, extending the forbearance until February 19, 2008, but the parties failed to reach a consensus for a forbearance beyond that date.

By virtue of cross-default provisions, the Borrowing Group's default under JPMorgan Chase's Credit Agreement triggered defaults under the Noteholder Debt instruments. Over the months that followed, the Noteholder Group's advisors, FTI Consulting, Inc. ("FTI") were given access to Woodside Group's books and records, its management, its financial advisors, Alvarez & Marsal ("A & M"), and its restructuring counsel, Pachulski Stang Ziehl & Jones, LLP ("Pachulski, Stang"). However, Woodside Group and the Noteholder Group were unable to reach an agreement regarding forbearance. As negotiations with the Bank Group and the Noteholder Group toward a consensual resolution continued into August 2008, Woodside Group

agreed to continued to operate within certain budgets and to provide financial reporting to FTI.

E. *The Voluntary Petitions of Woodside AMR 107, Inc. & Woodside Portofino, Inc.*

On March 31, 2008, Woodside AMR 107, Inc. ("AMR 107") and Woodside Portofino, Inc. ("Portofino"), two of Woodside Group's Restricted Subsidiaries, filed voluntary petitions under chapter 11 of the Code.[9] Woodside Group viewed the filings as a necessary step to implementing any global restructuring of its debt obligations that resulted from the ongoing settlement negotiations with the Bank Group and Noteholder Group.[10] The Bank Group and Noteholder Group took an entirely different view, considering the filings as preemptive and inconsistent with good faith negotiations. In response thereto, the Bank Group accelerated approximately $335 million due under the Credit Agreement and the Noteholder Group accelerated nearly $372 million due on the Noteholder Debt. Notwithstanding the filing of the two chapter 11 cases, however, the

---

8. Ex. 4, at 1, §§ D & E.

9. Woodside AMR 107, Inc. filed a voluntary chapter 11 petition in Case No. 6:08–bk–13394–PC, and Woodside Portofino, Inc. filed a voluntary chapter 11 petition in Case No. 6:08–bk–13396–PC.

10. Indeed, AMR 107 and Portofino contemplated the possibility of bankruptcy filings by other Woodside Entities, stating in the Debtors' Chapter 11 Preliminary Status Report filed in each case on July 3, 2008:

> The Debtors and their related entities are currently in the process of entering into negotiations with the Bank Group and with the holders of the Noteholder Debt (*"Noteholders"*) in efforts to consensually work out a longer-term, global restructuring of these debt obligations and obviate, to the extent possible, the need for the other

Woodside Group entities to file bankruptcy proceedings. It remains undetermined whether a global restructuring is susceptible of implementation outside of a chapter 11 plan process. If further filings become necessary, the Debtors' affiliated entities and their professionals will work with the Bankruptcy Court and the Office of the United States Trustee to implement such filings in an organized and systematic manner. . . .

> The Debtors seek to enter into a consensual global restructuring with all constituent members of the Bank Group and the Noteholders. To the extent a significant majority but not all members of the Bank Group and the Noteholders support a restructuring plan, the Debtors may seek to confirm a plan under Section 1129(b) of the Bankruptcy Code as to those non-consenting members.

*Id.* at 3:21–4:11 (emphasis in original).

Bank Group and Noteholder Group continued negotiations with Woodside Group toward a long-term restructuring of the indebtedness.

### F. Default Under the Zion's Credit Facility

Woodside Group also defaulted under the Zions credit facility in late 2007. On or about, April 8, 2008, Zions issued a notice of default under its credit facility of approximately $130 million. In June 2008, Zions filed suit in Utah state court against the Zions Borrowers and Zions Guarantors to enforce the provisions of its loan agreement which required the collateralization of its outstanding debt obligations upon the occurrence of certain defaults. At that time, it was discovered that seven properties that were part of the Zions' borrowing base were, in fact, owned by certain Restricted Subsidiaries that were not parties to the Zions' credit facility. On August 19, 2008, a stipulation was executed with Zions under the terms of which Zions received two deeds of trust executed by Zions Borrowers, Walnut Creek Development, LLC and Danville Land Investments, LLC, respectively, to secure the approximately $128 million then owing to Zions. Title to the seven properties was transferred from the Restricted Subsidiaries to certain Unrestricted Subsidiaries, without the knowledge or consent of the Bank Group, for the purpose of "truing up" ownership of the properties forming the Zions' borrowing base. In consideration therefor, Zions dismissed the state court action and agreed to forbear from exercising its rights and remedies against the Zions Borrowers and Zions Guarantors.

### G. Woodside Group's Dividends to Shareholders

From its inception until July 25, 2008, Woodside Group was a Nevada corporation that had elected to be treated as a subchapter S corporation under the Internal Revenue Code.[11] As a qualified subchapter S corporation, Woodside Group was a "pass through" entity for income tax purposes, *i.e.*, the income and losses of the corporation were attributed directly to its shareholders. Woodside Group's subsidiaries were also organized as qualified subchapter S corporations or as limited liability companies. With respect to dividends, Woodside Group's stated policy was that it was "under no obligation to issue dividends or distributions" and that it expected to "retain most or all income for additional investment opportunities."[12]

---

**11.** 26 U.S.C. § 1, *et seq.*

**12.** For example, Woodside Group's Confidential Disclosure and Limited Offering Memorandum dated January 13, 2006 ("2006 Offering Memo"), states:

- **We Do Not Intend to Pay Significant Distributions or Dividends.** We currently intend to retain any future earnings to fund growth and, therefore, do not expect to pay any dividends or distributions in the foreseeable future, except as the Companies may elect in order to assist the Shareholders/Members to pay the income of the Companies attributable to them under the tax laws.

Ex. 45, at 9. The 2006 Offering Memo further states:

*Dividends and Distributions.* [T]he Companies are under no obligation to issue dividends or distributions. It is anticipated that the Companies will retain most or all income for additional investment opportunities. If the Companies recognize income for tax purposes, the income is attributable to its members in proportion to their membership interests. *The Companies may issue a distribution for the purpose of assisting its Members with their tax obligations related to the attributed income, but the Companies are under no obligation to do so.* Since the formation of the Companies, dividends and distributions have typically been limited to certain amounts calculated on an equal basis to assist owners in the Companies to pay the income tax on that portion of the Companies' income attributable to them. There is no guarantee that any such distribution, if they occur, will in fact com-

However, it was Woodside Group's practice to declare dividends and make regular distributions to its shareholders for the purpose of providing them cash to pay the portion of their federal and state income taxes attributable to Woodside Group's income. Because shareholders of subchapter S corporations must receive equal pro rata distributions, Woodside Group fixed the amount of each periodic dividend by calculating the highest potential tax liability of any single shareholder using an assumed federal income tax rate of 35% and California's income tax rate of 9.3%. Woodside Group then estimated its gross taxable income, applied the projected maximum tax rate of 44.3%, and directed PHI to disburse the dividends to shareholders. Cash dividends generally were accompanied by a letter advising the shareholder that the funds were "to assist you in paying your taxes ... on the income from Woodside Group, Inc. and Pleasant Hill Investments, LC, as well as a return on your investment." [13] However, notwithstanding the timing and amount of each dividend, there was no restriction on how the money was to be used. Distributions to Nilson, Arave, and various other members of Nilson's family or their trusts were not paid in cash, but were treated by the company as payments on a "shareholder note" and then disbursed to cover the particular shareholder's checks and wire transfers to taxing authorities. Senior management consisting of Nilson, Nelson, and Arave, together with their extended families and their family trusts, constituted approximately 97% of the dividend distributions to shareholders. Woodside Group declared and distributed $234 million in dividends to shareholders in 2006 and 2007 primarily for payment of their maximum estimated taxes.[14] Dividends were paid by Woodside Group as late as May 9, 2008,[15] notwithstanding the existing defaults to the Bank Group and Noteholder Group and the pending bankruptcies of AMR 107 and Portofino.

## H. The Corporate Restructuring

On July 25, 2008, Woodside Group consummated a restructuring under which Woodside Group, Inc., a subchapter S corporation, was converted to Woodside Group, LLC, a limited liability company. As part of the restructuring, about 105 Restricted Subsidiaries, including AMR 107 and Portofino, were converted from subchapter S corporations and merged into at least 10 new limited liability compa-

---

pensate for the tax liability incurred by each owner due to ownership in the Companies.

*Id.* at 20 (emphasis added). Finally, the 2006 Offering Memo cautioned:

● **No Significant Tax Benefits.** Investment in the Shares and Units is not expected to yield any significant tax benefits to the Shareholders/Members. The purpose of the Company is to generate economic profits, taxable as ordinary income, from the proceeds received from the business operations of the Companies.

*Id.* at 24. Woodside Group made similar disclosures in its Confidential Disclosure and Limited Offering Memorandum dated January 19, 2007. Ex. 46, at 9, 20 & 23.

**13.** Ex. 160, at 5.

**14.** The minutes of meetings of Woodside Group's Board of Directors state the following distributions were authorized as dividends to shareholders in 2006 and 2007:

| | |
|---|---|
| January 11, 2006 | $ 62,007,678.60 |
| April 13, 2006 | 46,612,863.00 |
| June 15, 2006 | 29,408,479.02 |
| September 15, 2006 | 26,089,235.48 |
| September 20, 2006 | 13,974,120.60 |
| September 21, 2006 | 9,739,538.60 |
| April 12, 2007 | 18,445,429.08 |
| June 12, 2007 | 14,807,110.50 |
| September 12, 2007 | 12,691,809.90 |
| | $ 233,776,264.78 |

Ex. 30, at 1–14.

**15.** Woodside Group's Board of Directors authorized a distribution to shareholders of dividends totaling $254,425 on May 9, 2008. Ex. 30, at 15.

nies or partnerships, and another 13 corporations affiliated with Woodside Group were converted into limited liability companies (the "Corporate Restructuring"). The Corporate Restructuring was undertaken by senior management without disclosure to the Bank Group, Noteholder Group, or the court in the *AMR 107* and *Portofino* chapter 11 cases.[16] Indeed, Woodside Group's senior management kept the Corporate Restructuring a secret from its own restructuring professionals, A & M and Pachulski, Stang, by privately retaining, at Woodside Group's expense, the accounting firm of Ernst & Young and the law firm of Parr Waddoups Brown Gee & Loveless ("Parr Waddoups") to create and implement the plan of conversion.

For tax purposes, the Corporate Restructuring enabled Woodside Group to write down the value of its assets to $1.28 billion—the estimated amount of Woodside Group's debt to third parties, plus approximately $330 million of intercompany debt owed to PHI—to trigger a loss of approximately $500 million. Due to the "pass-through" nature of subchapter S corpora-tions, the tax loss generated by the Corporate Restructuring flowed directly to Woodside Group's shareholders. The Corporate Restructuring's primary purpose was to permit Woodside Group's shareholders to secure the write-down, apply their respective portions of the write-down to taxable income recognized in 2006 and 2007, and to receive state and federal tax refunds collectively exceeding $110 million.

On August 15, 2008, the Noteholder Group discovered Woodside Group's undisclosed Corporate Restructuring plan as it was being executed. With the discovery, the Bank Group and Noteholder Group concluded that they could no longer trust Woodside Group's senior management to negotiate in good faith an out-of-court restructuring of its obligations to the parties.

I. *The Involuntary Petitions*

On August 20, 2008, the Noteholder Group filed an involuntary petition against Woodside Group under chapter 11 of the Code. Between August 20, 2008, and August 22, 2008, the Noteholder Group filed similar involuntary petitions against 184 of Woodside Group's subsidiaries and affiliates.[17] The Bank Group immediately joined

---

**16.** The Corporate Restructuring included a transfer AMR 107 and Portofino into a new entity, WDS Holdings, Inc., a wholly-owned subsidiary of Woodside Group. Ex. 183.

**17.** The Noteholder Group's involuntary petitions targeted not only Woodside Group, but the following 184 Restricted Subsidiaries: (1) BCD 99, LLC, Case No. 6:08–bk–20690–PC filed on August 20, 2008; (2) Foxboro 50's, LLC, Case No. 6:08–bk–20754–PC filed on August 20, 2008; (3) Foxboro Coventry, LLC, Case No. 6:08–bk–20755–PC filed on August 20, 2008; (4) Foxboro Estates, LLC, Case No. 6:08–bk–20756–PC filed on August 20, 2008; (5) Foxboro Villages, LLC, Case No. 6:08–bk–20757–PC filed on August 20, 2008; (6) Ivy-wood Interior Design, LLC, Case No. 6:08–bk–20758–PC filed on August 20, 2008; (7) Menifee Woodside, LLC, Case No. 6:08–bk–20714–PC filed on August 20, 2008; (8) MHA 02, LLC, Case No. 6:08–bk–20728–PC filed on August 20, 2008; (9) Monterey Woodside, LLC, Case No. 6:08–bk–20729–PC filed on August 20, 2008; (10) MWG 00, LLC, Case No. 6:08–bk–20730–PC filed on August 20, 2008; (11) MWL 01, LLC, Case No. 6:08–bk–20734–PC filed on August 20, 2008; (12) Oquirrh Highlands Condominiums, LLC, Case No. 6:08–bk–20759–PC filed on August 20, 2008;

(13) Pleasant Hill Investments, LC, Case No. 6:08–bk–20686–PC filed on August 20, 2008; (14) Pleasant Valley Investments, LLC, Case No. 6:08–bk–20760–PC filed on August 20, 2008; (15) Portola Development Company, LLC, Case No. 6:08–bk–20762–PC filed on August 20, 2008; (16) Portola Development Arizona, LLC, Case No. 6:08–bk–20763–PC filed on August 20, 2008; (17) Portola Development Utah, LLC, Case No. 6:08–bk–20764–PC filed on August 20, 2008; (18) Saratoga Land Development, LLC, Case No. 6:08–bk–20765–PC filed on August 20, 2008; (19) Sonora HOA Management, LLC, Case No. 6:08–bk–20766–PC filed on August 20, 2008; (20) Sterling 69, LLC, Case No. 6:08–bk–20767–

PC filed on August 20, 2008; (21) TBB 03, LLC, Case No. 6:08–bk–20711–PC filed on August 20, 2008; (22) WDS GP, Inc., Case No. 6:08–bk–20768–PC filed on August 20, 2008; (23) WDS Holdings, Inc., Case No. 6:08–bk–20688–PC filed on August 20, 2008; (24) WGP Group, LLC, Case No. 6:08–bk–20770–PC filed on August 20, 2008; (25) Woodside 04N, LP, Case No. 6:08–bk–20692–PC filed on August 20, 2008;

(26) Woodside 04S, LP, Case No. 6:08–bk–20694–PC filed on August 20, 2008; (27) Woodside 05N, LP, Case No. 6:08–bk–20699–PC filed on August 20, 2008; (28) Woodside 05S, LP, Case No. 6:08–bk–20701–PC filed on August 20, 2008; (29) Woodside 06N, LP, Case No. 6:08–bk–20704–PC filed on August 20, 2008; (30) Woodside 07N, LP, Case No. 6:08–bk–20706–PC filed on August 20, 2008; (31) Woodside 20/25, LLC, Case No. 6:08–bk–20772–PC filed on August 20, 2008; (32) Woodside Aberdeen, LLC, Case No. 6:08–bk–20774–PC filed on August 20, 2008; (33) Woodside Allerton, LLC, Case No. 6:08–bk–20775–PC filed on August 20, 2008; (34) Woodside Amberly, LLC, Case No. 6:08–bk–20776–PC filed on August 20, 2008; (35) Woodside Amelia Lakes, LLC, Case No. 6:08–bk–20777–PC filed on August 20, 2008; (36) Woodside AMR 91, LLC, Case No. 6:08–bk–20744–PC filed on August 20, 2008; (37) Woodside Autumn Ridge, LLC, Case No. 6:08–bk–20735–PC filed on August 20, 2008; (38) Woodside Avalon Park, LLC, Case No. 6:08–bk–20778–PC filed on August 20, 2008; (39) Woodside Avalon, LLC, Case No. 6:08–bk–20779–PC filed on August 20, 2008;

(40) Woodside Ballantrae, LLC, Case No. 6:08–bk–20780–PC filed on August 20, 2008; (41) Woodside Bella Fresca, Inc., Case No. 6:08–bk–20782–PC filed on August 20, 2008; (42) Woodside Berkeley, LLC, Case No. 6:08–bk–20783–PC filed on August 20, 2008; (43) Woodside Bilby Ranch, Inc., Case No. 6:08–bk–21072–PC filed on August 22, 2008; (44) Woodside Blue Water Bay, LLC, Case No. 6:08–bk–20784–PC filed on August 20, 2008; (45) Woodside Bridges at Boulder Creek, LLC, Case No. 6:08–bk–20785–PC filed on August 20, 2008; (46) Woodside Brookstone, LLC, Case No. 6:08–bk–20786–PC filed on August 20, 2008; (47) Woodside Buffalo Ridge, LLC, Case No. 6:08–bk–20788–PC filed on August 21, 2008; (48) Woodside Cambria, LLC, Case No. 6:08–bk–20789–PC filed on August 21, 2008; (49) Woodside Canyon Creek, LLC, Case No. 6:08–bk–20790–PC filed on August 21, 2008; (50) Woodside Casa Palermo, LLC, Case No. 6:08–bk–20791–PC filed on August 21, 2008; (51) Woodside Castleton, LLC, Case No. 6:08–bk–20792–PC filed on August 21, 2008;

(52) Woodside Cedar Creek, LLC, Case No. 6:08–bk–20793–PC filed on August 21, 2008; (53) Woodside Clarendon Hills, LLC, Case No. 6:08–bk–20737–PC filed on August 21, 2008; (54) Woodside Clearwater, LLC, Case No. 6:08–bk–20794–PC filed on August 21, 2008; (55) Woodside Colonial Charles SFD, LLC, Case No. 6:08–bk–20795–PC filed on August 21, 2008; (56) Woodside Colonial Charles Villas, LLC, Case No. 6:08–bk–20796–PC filed on August 21, 2008; (57) Woodside Communities—WDC, LLC, Case No. 6:08–bk–20797–PC filed on August 21, 2008; (58) Woodside Communities of North Florida, LLC, Case No. 6:08–bk–20798–PC filed on August 21, 2008; (59) Woodside Cortez Heights, LLC, Case No. 6:08–bk–20799–PC filed on August 21, 2008; (60) Woodside Daytona Land, LLC, Case No. 6:08–bk–20800–PC filed on August 21, 2008; (61) Woodside Eagle Marsh North, LLC, Case No. 6:08–bk–20801–PC filed on August 21, 2008; (62) Woodside Eagle Marsh South, LLC, Case No. 6:08–bk–20802–PC filed on August 21, 2008; (63) Woodside Encore at Sunset Ranch, LLC, Case No. 6:08–bk–20803–PC filed on August 21, 2008; (64) Woodside Exeter South, LLC, Case No. 6:08–bk–20804–PC filed on August 21, 2008;

(65) Woodside Farmington Hollow Cottages, LLC, Case No. 6:08–bk–20805–PC filed on August 21, 2008; (66) Woodside Farmington Hollow Estates, LLC, Case No. 6:08–bk–20806–PC filed on August 21, 2008; (67) Woodside Farmington Meadows, LLC, Case No. 6:08–bk–20807–PC filed on August 21, 2008; (68) Woodside Fieldstone Ranch, LLC, Case No. 6:08–bk–20808–PC filed on August 21, 2008; (69) Woodside Fieldstone, LLC, Case No. 6:08–bk–20809–PC filed on August 21, 2008; (70) Woodside Finisterre, LLC, Case No. 6:08–bk–20810–PC filed on August 21, 2008; (71) Woodside Foothills Sunrise, LLC, Case No. 6:08–bk–20811–PC filed on August 21, 2008; (72) Woodside Foothills West, LLC, Case No. 6:08–bk–20812–PC filed on August 21, 2008; (73) Woodside Garden Gate, LLC, Case No. 6:08–bk–20813–PC filed on August 21, 2008; (74) Woodside Glenmere, Inc. (n/k/a Woodside GM, LLC), Case No. 6:08–bk–20736–PC filed on August 21, 2008; (75) Woodside Grande Premier, LLC, Case No. 6:08–bk–20814–PC filed on August 21, 2008; (76) Woodside Greyhawk, LLC, Case No. 6:08–bk–20815–PC filed on August 21, 2008; (77) Woodside Grouse Pointe, LLC,

Case No. 6:08–bk–20816–PC filed on August 21, 2008;

(78) Woodside Hearthstone, LLC, Case No. 6:08–bk–20817–PC filed on August 21, 2008; (79) Woodside Heritage Lake 129, Inc., Case No. 6:08–bk–20818–PC filed on August 21, 2008; (80) Woodside Heritage Lake 150, Inc., Case No. 6:08–bk–20820–PC filed on August 21, 2008; (81) Woodside Heritage Lake 7200, Inc., Case No. 6:08–bk–20821–PC filed on August 21, 2008; (82) Woodside Highland Ridge LLC, Case No. 6:08–bk–20825–PC filed on August 21, 2008; (83) Woodside Homes Corporation, Case No. 6:08–bk–20827–PC filed on August 21, 2008; (84) Woodside Homes of Arizona, Inc., Case No. 6:08–bk–20830–PC filed on August 21, 2008; (85) Woodside Homes of California, Inc., Case No. 6:08–bk–20832–PC filed on August 21, 2008;(86) Woodside Homes of Central California, Inc., Case No. 6:08–bk–20834–PC filed on August 21, 2008; (87) Woodside Homes of Florida, LLC, Case No. 6:08–bk–20837–PC filed on August 21, 2008; (88) Woodside Homes of Fresno, Inc., Case No. 6:08–bk–20840–PC filed on August 21, 2008; (89) Woodside Homes of Minnesota, Inc., Case No. 6:08–bk–20842–PC filed on August 21, 2008; (90) Woodside Homes of Nevada, Inc., Case No. 6:08–bk–20843–PC filed on August 21, 2008; (91) Woodside Homes of Northern California, Inc., Case No. 6:08–bk–20844–PC filed on August 21, 2008; (92) Woodside Homes of Reno, LLC, Case No. 6:08–bk–20845–PC filed on August 21, 2008; (93) Woodside Homes of South Texas, LLC, Case No. 6:08–bk–20846–PC filed on August 21, 2008; (94) Woodside Homes of Southeast Florida, LLC, Case No. 6:08–bk–20847–PC filed on August 21, 2008; (95) Woodside Homes of Southern California, LLC, Case No. 6:08–bk–20742–PC filed on August 20, 2008; (96) Woodside Home Sales Corp., Case No. 6:08–bk–20850–PC filed on August 21, 2008; (97) Woodside Hunters Creek, LLC, Case No. 6:08–bk–20852–PC filed on August 21, 2008; (98) Woodside Jackrabbit Estates, LLC, Case No. 6:08–bk–20855–PC filed on August 21, 2008; (99) Woodside Karston Cove, LLC, Case No. 6:08–bk–20861–PC filed on August 21, 2008; (100) Woodside Kinder Ranch, LLC, Case No. 6:08–bk–20864–PC filed on August 21, 2008; (101) Woodside Knoll Creek, LLC, Case No. 6:08–bk–20866–PC filed on August 21, 2008; (102) Woodside Land Holdings, LLC, Case No. 6:08–bk–20868–PC filed on August 21, 2008; (103) Woodside Las Colinas, LLC, Case No. 6:08–bk–20869–PC filed on August 21, 2008;(104) Woodside Legacy Oaks, LLC, Case No. 6:08–bk–20871–PC filed on August 21, 2008;

(105) Woodside Legacy, LLC, Case No. 6:08–bk–20738–PC filed on August 20, 2008; (106) Woodside Madison Colony, LLC, Case No. 6:09–bk–20872–PC filed on August 21, 2008; (107) Woodside Magma Ranch, LLC, Case No. 6:08–bk–20874–PC filed on August 21, 2008; (108) Woodside Majestic Oaks, LLC, Case No. 6:08–bk–20875–PC filed on August 21, 2008; (109) Woodside Meadows of Big Lake, LLC, Case No. 6:08–bk–20877–PC filed on August 21, 2008; (109) Woodside Menifee 105, Inc., Case No. 6:08–bk–20879–PC filed on August 21, 2008; (110) Woodside Montecatini, Inc., Case No. 6:08–bk–21073–PC filed on August 22, 2008; (111) Woodside Montrose, Inc., Case No. 6:08–bk–20881–PC filed on August 21, 2008; (112) Woodside Murabella, LLC, Case No. 6:08–bk–20882–PC filed on August 21, 2008; Woodside North MPLS, LLC, Case No. 6:08–bk20883–PC filed on August 21, 2008; (113) Woodside Northridge, LLC, Case No. 6:08–bk–20885–PC filed on August 21, 2008; (114) Woodside Palmilla, LLC, Case No. 6:08–bk–20886–PC filed on August 21, 2008; (115) Woodside Palomar, LLC, Case No. 6:08–bk–20893–PC filed on August 21, 2008; (116) Woodside Park Paseo, LLC, Case No. 6:08–bk–20895–PC filed on August 21, 2008;

(117) Woodside Parkview, LLC, Case No. 6:08–bk–20899–PC filed on August 21, 2008; (118) Woodside Paseo 5000, LLC, Case No. 6:08–bk–20746–PC filed on August 20, 2008; (119) Woodside Paseo 6000, LLC, Case No. 6:08–bk–20748–PC filed on August 20, 2008; (120) Woodside Paseo 7200, LLC, Case No. 6:08–bk–20750–PC filed on August 20, 2008; (121) Woodside Pebble Creek, LLC, Case No. 6:08–bk–20901–PC filed on August 21, 2008; (122) Woodside Preserve at Boulder Creek, LLC, Case No. 6:08–bk–20905–PC filed on August 21, 2008; (123) Woodside Provence, LLC, Case No. 6:08–bk–20906–PC filed on August 21, 2008; (124) Woodside Quail Crossing, LLC, Case No. 6:08–bk–20909–PC filed on August 21, 2008; (125) Woodside Rio Vista, LLC, Case No. 6:08–bk–20912–PC filed on August 21, 2008; (126) Woodside Riverwalk Preserve, LLC, Case No. 6:08–bk–20915–PC filed on August 21, 2008; (127) Woodside Rocking Horse, LLC, Case No. 6:08–bk–20916–PC filed on August 21, 2008; (128) Woodside Rockwell, LLC, Case No. 6:08–bk–20923–PC filed on August 21, 2008; (129) Woodside Rocky Pen, LLC, Case No. 6:08–bk–20927–PC filed on August 21, 2008; (130) Woodside Rogers Ranch, LLC, Case No.

as a petitioner in each of the involuntary petitions. On September 3, 2008, the court ordered that the 185 cases be jointly

6:08–bk–20937–PC filed on August 21, 2008; (131) Woodside Rosewood, LLC, Case No. 6:08–bk–20939–PC filed on August 22, 2008; (132) Woodside Royal Meadows, LLC, Case No. 6:08–bk–20940–PC filed on August 22, 2008; (133) Woodside S.O., LLC, Case No. 6:08–bk–20941–PC filed on August 22, 2008; (134) Woodside Scotland Heights, LLC, Case No. 6:08–bk–20942–PC filed on August 22, 2008; (135) Woodside Sienna, LLC, Case No. 6:08–bk–20943–PC filed on August 22, 2008; (136) Woodside Solano, LLC, Case No. 6:08–bk–20944–PC filed on August 22, 2008; (137) Woodside Somerset, LLC, Case No. 6:08–bk–20945–PC filed on August 22, 2008; (138) Woodside South Brook, LLC, Case No. 6:08–bk–20946–PC filed on August 22, 2008; (139) Woodside Southern Hills, LLC, Case No. 6:08–bk–20947–PC filed on August 22, 2008; (140) Woodside Southridge, LLC, Case No. 6:08–bk–20948–PC filed on August 22, 2008; (141) Woodside Springs at Boulder Creek, LLC, Case No. 6:08–bk–20949–PC filed on August 22, 2008; (142) Woodside Stonehaven, LLC, Case No. 6:08–bk–20950–PC filed on August 22, 2008; (143) Woodside Stoneybrook, LLC, Case No. 6:08–bk–20951–PC filed on August 22, 2008; (144) Woodside Summerwood, LLC, Case No. 6:08–bk–20952–PC filed on August 22, 2008; (145) Woodside Summit at Foothills Reserve, LLC, Case No. 6:08–bk–20953–PC filed on August 22, 2008; (146) Woodside Summit at Riverwalk, LLC, Case No. 6:08–bk–20954–PC filed on August 22, 2008; (147) Woodside Sunrise at Riverwalk, LLC, Case No. 6:08–bk–20955–PC filed on August 22, 2008; (148) Woodside Sunset Farms, LLC, Case No. 6:08–bk–20956–PC filed on August 22, 2008; (149) Woodside Talaverde, LLC, Case No. 6:08–bk–20958–PC filed on August 22, 2008; (150) Woodside Tampa Palms, LLC, Case No. 6:08–bk–20959–PC filed on August 22, 2008; (152) Woodside Tempe Village, LLC, Case No. 6:08–bk–20960–PC filed on August 22, 2008; (153) Woodside Texas Holdings, LLC, Case No. 6:08–bk–20962–PC filed on August 22, 2008; (154) Woodside Texas Land Holdings, LLC, Case No. 6:08–bk–20963–PC filed on August 22, 2008; (155) Woodside Thurnbeck, LLC, Case No. 6:08–bk–20964–PC filed on August 22, 2008; (156) Woodside Tierra Verde 301, LLC, Case No. 6:08–bk–20965–PC filed on August 22, 2008; (157) Woodside Timberlake, LLC, Case No. 6:08–bk–20969–PC filed on August 22, 2008; (158) Woodside Trails North at Horsemans Park, LLC, Case No. 6:08–bk–20972–PC filed on August 22, 2008; (160) Woodside Triana, LLC, Case No. 6:08–bk–20975–PC filed on August 22, 2008; (161) Woodside Trillium, LLC, Case No. 6:08–bk–20979–PC filed on August 22, 2008; (162) Woodside Trinity Oaks 55, LLC, Case No. 6:08–bk–20985–PC filed on August 22, 2008; (163) Woodside Trinity Oaks 65, LLC, Case No. 6:08–bk–20981–PC filed on August 22, 2008; (164) Woodside Tuscan Oaks, LLC, Case No. 6:08–bk–20995–PC filed on August 22, 2008; (165) Woodside Two Creeks 50, LLC, Case No. 6:08–bk–21002–PC filed on August 22, 2008; (166) Woodside Two Creeks 65, LLC, Case No. 6:08–bk–21007–PC filed on August 22, 2008; (167) Woodside Two Creeks Villas, LLC, Case No. 6:08–bk–21008–PC filed on August 22, 2008; (168) Woodside Valencia, LLC, Case No. 6:08–bk–21012–PC filed on August 22, 2008; (169) Woodside Via Valencia, LLC, Case No. 6:08–bk–21013–PC filed on August 22, 2008; (170) Woodside Via Ventura, Case No. 6:08–bk–21016–PC filed on August 22, 2008; (171) Woodside Vicinato, LLC, Case No. 6:08–bk–21017–PC filed on August 22, 2008; (172) Woodside Villa Palazzo, LLC, Case No. 6:08–bk–21018–PC filed on August 22, 2008; (173) Woodside Villa Palermo, LLC, Case No. 6:08–bk–21022–PC filed on August 22, 2008; (174) Woodside Vista Montana, LLC, Case No. 6:08–bk–20751–PC filed on August 20, 2008; (175) Woodside Walden, LLC, Case No. 6:08–bk–21024–PC filed on August 22, 2008; (176) Woodside Watson 308, LLC, Case No. 6:08–bk–21030–PC filed on August 22, 2008; (177) Woodside Weston Ranch, LLC, Case No. 6:08–bk–20753–PC filed on August 20, 2008; (178) Woodside Wildwood, LLC, Case No. 6:08–bk–21035–PC filed on August 22, 2008; (179) Woodside Willowbrook, LLC, Case No. 6:08–bk–21036–PC filed on August 22, 2008; (180) Woodside Wolf Creek 121, Inc., Case No. 6:08–bk–21068–PC filed on August 22, 2008; (181) Woodside Wolf Creek 126, Inc, Case No. 6:08–bk–21069–PC filed on August 22, 2008; (182) Woodside Wolf Creek 133, Inc., Case No. 6:08–bk–21070–PC filed on August 22, 2008; (183) Woodside Wolf Creek 138, Inc., Case No. 6:08–bk–21071–PC filed on August 22, 2008; and (184) Woodside Wolf Creek 77, Inc., Case No. 6:08–bk–21074–PC filed on August 22, 2008.

administered with AMR 107 and Portofino under Case No. 6:08–bk–20682–PC, Woodside Group, LLC, *et al.* On September 16, 2008, Woodside Group and the targeted subsidiaries and affiliates filed a consolidated answer to the involuntary petitions and consented to entry of an order for relief in each of the 185 cases.

On December 19, 2008, Woodside Ceramista City, LLC filed a voluntary chapter 11 petition in Case No. 6:08–bk–28171–PC and Woodside Ceramista Village, LLC filed a voluntary chapter 11 petition in Case No. 6:08–bk–28168–PC. None of the Unrestricted Subsidiaries are debtors in bankruptcy *except* Alameda Investments, LLC which filed a voluntary chapter 11 petition in Case No. 6:09–bk–10348–PC on January 9, 2009, and Liberty Holdings Group, LLC which filed a voluntary chapter 11 petition in Case No. 6:09–bk–13484–PC on February 26, 2009. Woodside Ceramista City, Woodside Ceramista Village, Alameda Investments, and Liberty Holdings Group are jointly administered with the other Woodside Entities under Case No. 6:08–bk–20682–PC, Woodside Group, LLC, *et al.*

### J. *Relevant Events During Bankruptcy*

On October 2, 2008, the Committee was appointed consisting of JPMorgan Chase, Bank of America, N.A., Wachovia Bank, National Association, John Hancock Life Insurance Company, MetLife Inc. & Affiliates, AXA Equitable Life Insurance Company, and Travelers Casualty & Surety Co. of America. Shortly before appointment of the Committee, the Noteholder Group on September 18, 2008, filed a motion seeking the appointment of a trustee or, alternatively, an examiner pursuant to § 1104. On November 3, 2008, the court denied the Noteholder Group's request for a trustee, but ordered the appointment of an examiner pursuant to § 1104(c). On November 19, 2008, the court approved the appointment of Paul S. Aronzon ("Aronzon"), as examiner, to investigate the financial affairs of Woodside Group and to report:

1. Whether Woodside Group or its creditors have any cognizable claims against Woodside Group's senior managers and/or its shareholders, including but not limited to, any claim for breach of fiduciary duty, attributable to the conversion of Woodside Group, Inc. from a subchapter S corporation to a limited liability company on July 25, 2008, which triggered a write down of its remaining assets by approximately $500 million, including the question of whether the acceleration of loss triggered by the Woodside conversion on July 25, 2008, should be unwound before December 31, 2008, to reinstate and preserve a basis of approximately $500 million in the assets of Woodside Group; and

2. Whether Woodside Group or its creditors have any cognizable claim against the shareholders with respect to the original distributions made to shareholders in 2006 and 2007 in order to pay the shareholders' "pass through" tax liabilities.[18]

On December 15, 2008, Aronzon filed his *Statement of Investigation Conducted by Examiner Paul S. Aronzon* (the "Examiner's Report") containing the results of his investigation together with his findings and conclusions. In response thereto, the Committee filed a motion seeking to expand Aronzon's powers as examiner to investigate and pursue, among other things, claims against Woodside Group's shareholders to recover tax distributions and refunds, and potential breaches of fiduciary duty allegedly committed by Woodside Group's senior management.

---

**18.** Ex. 101, at 2:3–9.

On February 13, 2009, the court approved a stipulation between Woodside Group and the Committee under the terms of which the Committee agreed to withdraw its motion to expand Aronzon's authority without prejudice. In consideration therefor, Woodside Group agreed, in pertinent part, that "pending the effective date of any plan of reorganization that retains the Estate Causes of Action to (or revests the Estate Causes of Action in) the reorganized debtors or any litigation trust, the Committee shall be authorized, on behalf of [Woodside Group], to investigate, prosecute and, subject to approval of this Court, settle the Estate Causes of Action." [19]

On November 25, 2009, an order was entered confirming the Second Amended Joint Plan of Reorganization of Woodside Group, LLC and Affiliated Debtors, as Modified, on November 24, 2009 (the "Plan"). The Plan provides for, among other things, a litigation trust. The effective date of the Plan was December 31, 2009.

### K. *JPMorgan Chase's Complaint*

On September 18, 2008, JPMorgan Chase filed a Complaint for Injunctive Relief against Woodside Group and its shareholders in Adversary No. 6:08–ap–01359– PC, styled *JPMorgan Chase Bank, N.A. v. Woodside Group, LLC, et al.*, seeking to enjoin them from taking further action to consummate the Corporate Restructuring. On September 23, 2008, the court issued a temporary restraining order against Woodside Group and its shareholders, together with an order to show cause why a preliminary injunction should not be entered. On October 2, 2008, the court approved a Stipulation to Entry of Agreed Upon Temporary Restraining Order pursuant to which Woodside Group and certain named defendants agreed not to take further action to consummate the Corporate Restructuring and tax event triggered by the reorganization pending further order of the court.

On January 23, 2009, the Committee filed a motion seeking to substitute itself as plaintiff in the adversary proceeding on the basis that as of October 2, 2008, the date on which the Committee was formed, the Committee assumed responsibility for addressing all issues relating to the Corporate Restructuring. On January 30, 2009, the court granted the Committee's motion and substituted the Committee for JPMorgan Chase as plaintiff in the adversary proceeding. On February 9, 2009, the court dismissed the adversary proceeding at the request of the parties.[20]

---

**19.** Order Approving Stipulation Resolving Potential Objections to (A) the Motion of the Debtors Seeking Approval of Certain Solicitation Procedures and (B) the Motion of the Official Committee of Unsecured Creditors Seeking to Expand the Scope of Powers of the Chapter 11 Examiner, Ex. A, at 5:4–8. The "Estate Causes of Action" were defined in the stipulation as the potential causes of action described in Aronzon's Examiner's Report "that might be pursued by [Woodside Group] against certain former and current officers, directors and shareholders of [Woodside Group] (together with any other causes of action against such parties that might flow from the facts described in the Trustee Motion or the Examiner's Report . . .)." *Id.* at 2:28–3:3.

**20.** The Stipulated Order Resolving and Dismissing Adversary Proceeding entered on February 9, 2009, authorized Woodside Group "to prepare and file [its] tax returns for the calendar year 2008 based upon, and reflecting the Tax Reorganization . . . provided [Woodside Group] provide a copy of such returns to the Committee in advance of filing with the appropriate taxing authorities." The order further stated that "nothing in this Order shall be construed to restrain any individual named as a defendant . . . from filing any tax returns individually, as beneficiaries of any trust, or for any person or entity other than the Entity Defendants."

## L. *The Committee's Complaint*

On September 17, 2009, the Committee filed its complaint in this adversary proceeding seeking relief against the Defendants, as shareholders of Woodside Group and PHI, for alleged unjust enrichment; fraudulent transfers under Nev.Rev.Stat. §§ 112.140, *et seq.*, Utah Ann.Code § 25-6-6(2), and 11 U.S.C. §§ 548, 550, and 551; avoidable insider preferences under 11 U.S.C. §§ 547(b), 550, and 551; and unlawful distributions pursuant to Nev.Rev.Stat. § 78.288(2). The Committee's complaint also seeks relief against Defendants, Nilson, Nelson and Farnsworth[21] for alleged breach of fiduciary duty as officers and/or directors of Woodside Group and PHI. On September 24, 2009, the Committee filed its motion requesting issuance of a preliminary injunction to preserve state and federal tax refunds exceeding $110 million either received, or to be received, by the Defendants for tax years 2006 and 2007 pending a trial on the merits of the Committee's claims.[22] On October 2, 2009, the Nilson Defendants filed their response in opposition to the motion, arguing that the requested injunction should not issue because the Committee is unable to make a clear showing of either likely success on the merits or likely irreparable harm absent the relief sought. Seven days later, the Nilson Defendants filed their answer to the Committee's complaint. Crockett and Ure answered the Committee's complaint on October 30, 2009.

After a brief period for discovery, the court commenced an evidentiary hearing on November 23, 2009, to consider the merits of the Committee's motion. At the hearing, the Committee introduced testimony and evidence only concerning the merits of its unjust enrichment theory to support its request for preliminary relief. At the conclusion of the hearing on November 25, 2009, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This proceeding involves both core and non-core matters. Venue is appropriate in this court. 28 U.S.C. § 1409(a).

### A. *Standard for Preliminary Injunction.*

Rule 65(a)(1) permits the court to issue a preliminary injunction on notice to the adverse party.[23] F.R.Civ.P. 65(a)(1). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council,* ─ U.S. ─, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008); *see Munaf v. Geren,* 553 U.S. 674, 128 S.Ct. 2207, 2218–2219, 171 L.Ed.2d 1 (2008) ("A preliminary injunction is an extraordinary and drastic reme-

---

**21.** The complaint was dismissed as to Farnsworth with prejudice by stipulation filed on December 31, 2009.

**22.** The parties concede that the tax refunds at issue in this adversary proceeding could substantially exceed $110 million given the impact of the Worker, Homeownership, and Business Assistance Act of 2009, Pub.L. No. 111–92, enacted on November 6, 2009, which provides, among other things, that a taxpayer with net operating losses ("NOLs") for 2008 or 2009 may elect to carry the NOL from one of those years back to the third, fourth, or fifth preceding taxable year instead of the second taxable year. On November 20, 2009, the Internal Revenue Service ("IRS") issued Revenue Procedure 2009–52 which outlines the procedure for making such an election.

**23.** Rule 65(a)(1) is applicable to adversary proceedings by virtue of FRBP 7065, which states that "Rule 65 F.R.Civ.P. applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor in possession without compliance with Rule 65(c)." FRBP 7065.

dy."). A prohibitory injunction prevents parties from taking action and "preserve[s] the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Court,* 840 F.2d 701, 704 (9th Cir. 1988); *see Heckler v. Lopez,* 463 U.S. 1328, 1333, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1983) (stating that a prohibitory injunction "freezes the positions of the parties until the court can hear the case on the merits").

■ To obtain a preliminary injunction, the moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." [24] *Winter,* 129 S.Ct. at 374; *see Sierra Forest Legacy v. Rey,* 577 F.3d 1015, 1021 (9th Cir.2009). "In each case, courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.' " *Winter,* 129 S.Ct. at 376 (quoting *Amoco Prod. Co. v. Gambell,* 480 U.S. 531, 542, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

■ Generally, a preliminary injunction may not issue simply to freeze unencumbered assets pending an adjudication of the plaintiff's cause of action against a defendant. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.,* 527 U.S. 308, 333, 119 S.Ct. 1961, 144 L.Ed.2d 319 (1999) ("[W]e hold that the district court had no authority to issue a preliminary injunction preventing petitioners from disposing of their assets pending an adjudication of respondent's contract claim for money damages."). However, the Ninth Circuit has held that "where . . . a party in an adversary bankruptcy proceeding alleges fraudulent conveyance or other equitable causes of action, *Grupo Mexicano* does not bar the issuance of a preliminary injunction freezing assets." *Rubin v. Pringle (In re Focus Media, Inc.),* 387 F.3d 1077, 1085 (9th Cir.2004), *cert. denied,* 544 U.S. 923, 125 S.Ct. 1674, 161 L.Ed.2d 482 (2005).

### B. *Choice of Law*

■ Bankruptcy courts apply federal choice of law rules. *Liberty Tool & Mfg. v. Vortex Fishing Sys., Inc. (In re Vortex Fishing Sys., Inc.),* 277 F.3d 1057, 1069

---

**24.** Prior to *Winter,* the Ninth Circuit recognized two differing standards for the issuance of a preliminary injunction. The traditional test required the plaintiff to establish "(1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest (in certain cases)." *Taylor v. Westly,* 488 F.3d 1197, 1200 (9th Cir.2007). The "alternative test" required that "plaintiff demonstrate either a combination of a probable success on the merits and the possibility of irreparable injury or that serious questions are raised and the balance of hardships tips sharply in his favor." *Id.* "These two formulations represent[ed] two points on a sliding scale in which the required degree of irreparable harm increase[d] as the probability of success decrease[d]. They [were] not separate tests but

rather outer reaches of a single continuum." *Id.* Some district courts in the Ninth Circuit have limited *Winter's* application, holding that the second prong of the alternative test remains viable. *See, e.g., Save Strawberry Canyon v. Dept. of Energy,* 613 F.Supp.2d 1177, 1180 n. 2 (N.D.Cal.2009) ("*Winter* does not foreclose injunctive relief in such situations."); *Stross v. Gables Condominium Ass'n,* 2009 WL 1770129, *2 (W.D.Wash.2009) (construing *Winter* as modifying only the traditional test). *See also Brady Campaign To Prevent Gun Violence v. Salazar,* 612 F.Supp.2d 1, 12 (D.D.C.2009) (stating that "the D.C. Circuit's sliding-scale standard remains viable even in light of the decision in *Winter* "). However, the Ninth Circuit has clarified "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Am. Trucking Ass'ns, Inc. v. City of L.A.,* 559 F.3d 1046, 1052 (9th Cir.2009).

(9th Cir.2002); *see Lindsay v. Beneficial Reinsurance Co. (In re Lindsay),* 59 F.3d 942, 948 (9th Cir.1995) ("In federal question cases with exclusive jurisdiction in federal court, such as bankruptcy, the court should apply federal, not forum state, choice of law rules."). "Federal choice of law rules follow the approach of the Restatement (Second) of Conflict of Laws." *Vortex Fishing,* 277 F.3d at 1069; *see Chuidian v. Philippine Nat'l Bank,* 976 F.2d 561, 564 (9th Cir.1992).

■ Section 221 of the Restatement (Second) of Conflict of Laws ("Restatement"), which sets out the rule when a court is faced with a choice of law regarding restitution, states:

(1) In actions for restitution, the rights and liabilities of the parties with respect to the particular issue are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where a relationship between the parties was centered, provided that the receipt of enrichment was substantially related to the relationship,

(b) the place where the benefit or enrichment was received,

(c) the place where the act conferring the benefit or enrichment was done,

(d) the domicil, residence, nationality, place of incorporation and place of business of the parties, and

(e) the place where a physical thing, such as land or a chattel, which was substantially related to the enrichment, was situated at the time of the enrichment. These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Restatement § 221. Section 6(2) of the Restatement sets forth the following factors the court must apply to determine which state has the "most significant relationship" to the parties and the occurrence:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of a particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

Restatement § 6(2).

Applying the principles set forth in Restatement §§ 6(2) and 221, the court finds that Nevada law governs this dispute. Utah has an interest in regulating Woodside Group, as its principal offices are in Utah. However, the Restatement factors weigh in favor of Nevada. Woodside Group and its affiliate, PHI, are incorporated under the laws of the state of Nevada. Woodside Group does business in eight states, including Nevada, and maintains a regional office in Las Vegas, Nevada. Nilson, Woodside Group's Chief Executive Officer, and his spouse, Leicha B. Nilson, reside in Nevada. Nilson and his spouse are Woodside Group's controlling shareholders, owning 90% of the outstanding stock of the corporation. Nilson and his spouse are also the controlling shareholders of PHI. The dividends that gave rise to the tax refunds at issue were de-

clared by Woodside Group and paid through PHI pursuant to Nevada law.

Because Woodside Group's controlling shareholders reside in Nevada, the largest portion of the dividends declared by Woodside Group in 2006, 2007, and 2008 were paid to residents of Nevada. Conversely, tax refunds attributable to taxes paid with such dividends have been, or will be, received by Nevada residents. Not only are Nevada's connections with the Committee's claim "considerably more substantial, immediate, and concrete" than Utah's, but the interests of Utah will not suffer by the application of Nevada law to the disputed issues pending before the court. *See Aalmuhammed v. Lee*, 202 F.3d 1227, 1237 (9th Cir.1999) ("The question is which state's interest would suffer more by the application of the other's law."). Finally, the application of Nevada law is consistent with the Restatement's guidance that local law be selected in a manner that promotes "certainty, predictability and uniformity of result" and "ease in the determination and application of the law to be applied." Restatement § 6(2)(f) & (g). Therefore, Nevada law on unjust enrichment will be applied.

## C. *Likelihood of Success on the Merits*

Pursuant to *Winter*, the Committee must demonstrate that it is "likely to succeed on the merits." 129 S.Ct. at 375–376; *see Stormans Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir.2009). The Committee asserts seven distinct causes of action in its complaint, but has urged only one claim in support of its request for a preliminary injunction—unjust enrichment.

### 1. *Unjust Enrichment*

 Under Nevada law, "[u]njust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." *Unionamerica Mortgage and Equity Trust v. McDonald*, 97 Nev. 210, 626 P.2d 1272,

1273 (1981). "Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or equity and good conscience." *Nev. Indus. Dev., Inc. v. Benedetti*, 103 Nev. 360, 741 P.2d 802, 804 n. 2 (1987); *see Coury v. Robison*, 115 Nev. 84, 976 P.2d 518, 521 (1999). In Nevada, "the terms 'restitution' and 'unjust enrichment' are the modern counterparts of the doctrine of quasi-contract." *Unionamerica Mortgage*, 626 P.2d at 1273. When a defendant has been unjustly enriched by the receipt of benefits in a manner not governed by contract, a contract is implied under Nevada law once the plaintiff establishes three essential elements: " '[A] benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.' " *Leasepartners Corp. v. Robert L. Brooks Trust*, 113 Nev. 747, 942 P.2d 182, 187 (1997) (quoting *Unionamerica Mortgage*, 626 P.2d at 1273). Unjust enrichment generally is unavailable when a valid, express contract exists that governs the subject matter of the dispute. *Id.*

### 2. *Defendants' Contentions*

Defendants assert that the Committee has no likelihood of success on the merits of its unjust enrichment claim for three reasons. First, Woodside Group's payment of the dividends was authorized under Nevada law which provides, in pertinent part:

1. Except as otherwise provided in subsection 2 and the articles of incorporation, a board of directors may authorize and the corporation may make distributions to its stockholders, including distributions on shares that are partially paid.

2. No distribution may be made if, after giving it effect:

(a) The corporation would not be able to pay its debts as they become due in the usual course of business; or

(b) Except as otherwise specifically allowed by the articles of incorporation, the corporation's total assets would be less than the sum of its total liabilities plus the amount that would be needed, if the corporation were to be dissolved at the time of distribution, to satisfy the preferential rights upon dissolution of stockholders whose preferential rights are superior to those receiving the distribution.

3. The board of directors may base a determination that a distribution is not prohibited pursuant to subsection 2 on:

(a) Financial statements prepared on the basis of accounting practices reasonable under the circumstances;

(b) A fair valuation, including, but not limited to, unrealized appreciation and depreciation; or

(c) Any other method that is reasonable in the circumstances.

Nev.Rev.Stat. § 78.228. Defendants argue that, in authorizing the dividends, Woodside Group's senior management relied on KPMG audited financial statements for 2006 and 2007, which showed a solvent company. The Committee's attack that the shareholders' received dividends of nearly 44% of the company's profits ignores not only the fact that Woodside Group's shareholders left 56% of the net profits in the company, but that § 5.5.3 of the Credit Agreement itself permits up to 75% of profits to be distributed to shareholders.[25]

Secondly, the Committee is unable to establish a direct benefit conferred by either the Committee or Woodside Group on the Defendants. The Committee seeks to recover tax refunds that were paid to the Defendants by the IRS and state taxing authorities. Defendants point out that the tax refunds are not a return of dividends paid by Woodside Group, but of taxes paid by the Defendants.[26] Woodside Group, as a subchapter S corporation, was a pass-through entity for income tax purposes. Because Defendants, as shareholders, paid taxes on the income of Woodside Group, Defendants had the corresponding right, as shareholders, to carry back any tax losses and claim any tax refunds triggered by such losses. Defendants reason that the only choice facing senior management in July 2008 was to get the money or leave it with the IRS. Senior management, according to Defendants, would arguably have breached a fiduciary duty to Woodside Group's shareholders had it failed to structure a reorganization that maximized tax benefits to its shareholders.

Finally, Defendants argue that the facts of this proceeding are nearly identical to

---

**25.** Section 5.3.3 of the Credit Agreement states:

*Minimum Borrowing Group Net Worth.* Combined Tangible Net Worth of the members of the Borrowing Group shall not be less than the sum of: (a) $548,000,000, plus (b) twenty-five percent (25%) of the net income of the members of the Borrowing Group earned for each fiscal quarter after December 31, 2005 (excluding any quarter in which there is a net loss), plus (c) ninety percent (90%) of the net proceeds for any equity issued by the members of the Borrowing Group after the Effective Date.

Ex. 1, at 57.

**26.** "IRC § 6402(a) authorizes the Secretary of the Treasury to pay a refund to a person who made an overpayment of taxes. In this case, the Defendants are the parties who overpaid the taxes that were subsequently refunded. Neither Woodside nor Plaintiff paid any portion of those taxes and, consequently, had no entitlement to the refunds that were paid." Defendants' Response to Plaintiff's "Trial Brief" Submitted in Opposition to Motion for Preliminary Injunction, at 5:n.6.

those confronting the bankruptcy court in *Official Comm. of Unsecured Creditors v. Forman (In re Forman Enterprises, Inc.),* 281 B.R. 600 (Bankr.W.D.Pa.2002), and therefore, the decision in *Forman Enterprises* should be dispositive.

### 3. *The Forman Enterprises Case*

In *Forman Enterprises,* Sam Forman, Larry Ashinoff, Brett Forman, Wendy Forman, and Richard Forman (collectively, the "Formans") each owned shares of Forman Enterprises, Inc. ("Forman Enterprises"), a subchapter S corporation. Each held their shares in Forman Enterprises, subject to a shareholders' agreement dated February 19, 1996, which provided, in pertinent part, in § 9.01:

> .... Commencing with tax-year 1996 and for each year thereafter for which the [debtor] is an S corporation for federal income tax purposes, the [debtor] shall pay a dividend to each of the stockholders to allow such stockholder to pay the federal and state income tax or tax estimates payable by such stockholders attributable to such stockholders' allocable share of the [debtor's] income computed for such year.

*Id.* at 604. Each received dividends in 1997, 1998, and 1999 pursuant to § 9.01 of the shareholder agreement to pay income taxes owed on their respective share of Forman Enterprises's actual or estimated taxable income for 1997, 1998, and 1999. After the payment of dividends in 1999, Forman Enterprises estimated that it would actually sustain a loss for 1999 of up to $1,500,000. Four of the five shareholders, at the request of Forman Enterprises, each executed a promissory note evidencing repayment of the 1999 dividends received not later than December 31, 1999. Forman Enterprises carried as an account receivable the dividends paid in 1999 to the remaining shareholder, who refused to sign a note to the corporation. The notes and account receivable were assigned to PNC Bank. Forman Enterprises filed its federal income tax return for 1999 reporting a NOL of $16,695,074. The Formans filed their personal income tax returns for 1999, carried back the corporation's NOL to tax years 1997 and 1998, and collectively sought tax refunds for those years in excess of $5,289,000.

On January 26, 2000, Forman Enterprises filed a voluntary chapter 11 petition. Approximately two years later, the creditors' committee filed an adversary proceeding against the Formans alleging claims for unjust enrichment, breach of fiduciary duty, and unauthorized post-petition transfer under § 549, and seeking to recover the tax benefits and refunds received by the Formans attributable to the corporation's 1999 NOL. On June 6, 2001, the Forman Enterprises case was converted to a liquidation under chapter 7. The chapter 7 trustee, who succeeded the creditors' committee as plaintiff in the adversary proceeding, did not dispute that the Formans had "complied with the requirements of the Internal Revenue Code in carrying back the NOL to prior taxable years to obtain refunds of income taxes paid for those years" and conceded that the Formans were "entitled to refunds under the Internal Revenue Code." *Id.* at 606. After a trial on the merits, "the bankruptcy court rejected the chapter 7 trustee's unjust enrichment claim based on the facts of the case, holding that it would not be inequitable or unjustifiable for [the Formans] to retain for themselves the tax refunds arising out of their utilization of the 1999 NOL suffered by the debtor." *Id.* at 608. In so holding, the court stated:

> The chapter 7 trustee's theory of the case, especially the cause of action for unjust enrichment, is predicated on the proposition that the *debtor,* not defendants, paid defendant's income taxes while *defendants* retained the tax refunds. Were this characterization accurate, we might be inclined to agree with

the trustee that it would be inequitable or unjustifiable, and that defendants would be unjustly enriched, if they were to retain the tax refunds for themselves when debtor had paid the income taxes they owed.

Looking at the issue from a different perspective, it is clear that if the shareholders had a tax liability for the tax years 1995, 1996, 1997, and 1998, that the corporation earned a profit during that period. Rather than taking all of the profit and utilizing a portion of same to pay the tax, the shareholders merely took a sum sufficient to pay the tax and left the balance in the corporation as a capital infusion. Greedy insiders having no concern for creditors might not have elected this option. These shareholders did so elect.

We reject the chapter 7 trustee's "spin" concerning who paid defendants' income taxes in the first place. As we see it, defendants, not debtor, paid the income taxes defendants owed as shareholders of an S corporation.

In accordance with § 9.01 of the shareholders' agreement, debtor merely paid a dividend from its income to each shareholder so the shareholder could pay income tax he or she owned that was attributable to the shareholder's allocable share of debtor's income. When viewed in this light, *without something more* it would *not* be inequitable or unjustifiable for defendants to retain for themselves a refund of income taxes

they themselves paid from dividends from income they had received as shareholders of an S corporation.

*The trustee offered no evidence showing that this arrangement between the debtor and defendants was "done on the sly" or that it was an artifice devised by defendants to benefit themselves and to deprive debtor's creditors should debtor become insolvent.* It instead was done so defendants could lawfully avail themselves of the tax benefits provided by the Internal Revenue Code concerning S corporations.

*Id.* at 609 (emphasis added).

4. *The Committee Has Established a Likelihood of Success on the Merits*

 First, the Committee has established that a benefit was conferred by Woodside Group on the Defendants. Woodside Group's stated policy was that it was "under no obligation to issue dividends or distributions" and that it expected to "retain most or all of its income for additional investment opportunities." [27] Yet Woodside Group distributed $234 million in dividends to its shareholders in 2006 and 2007. Shareholders *expected* to receive regular dividends from Woodside Group sufficient to pay any income tax obligation associated with their ownership interest in the corporation.[28] Nilson had represented to shareholders that they could expect such dividends,[29] notwithstanding Woodside Group's stated policy that such dividends were discretionary and

27. *See* footnote 12 *supra.*

28. "When we became a sub-S corporation long ago, we undertook an obligation in communication with all of the people who became shareholders to dividend out a sufficient amount so that they could pay their taxes as they came due. Given that we had made a lot of money, we paid out enough dividends so that all the shareholders could pay their taxes. Had we not done that, we would have been sued by everybody, I'm sure, who had stock

who couldn't pay their tax obligation." Ex. 200, at 294:23–295:6.

29. Q. Let me make sure I understand. Whenever the company sold stock to new shareholders, there was always a representation by you as the chairman of the board that the company was going to pay out dividends sufficient to meet individual tax obligations as they came due?
A. As they were associated with that income. *Id.* at 296:8–14.

the company was under no obligation to make them.[30]

Woodside Group calculated its dividend distributions to make certain that all taxes attributable to each shareholder's respective ownership interest in the corporation was paid. Senior management's formula for calculating dividends was clear. Based on projections of taxable income, senior management would periodically declare dividends using a rate of 44.3%, which assumed a federal income tax rate of 35% and California's income tax rate of 9.3%. Senior management timed each dividend distribution to coincide with estimated tax payments due by Woodside Group's shareholders to state and federal taxing authorities.[31] Once the final return was completed, a dividend would be declared in April "to make up for any shortcomings."[32] Arave, who set the amount of each dividend, testified that Woodside Group had a moral obligation to issue dividends for such purpose.[33] Woodside Group's treasurer, Chad Gardner, testified essentially that dividends would be paid if the company showed taxable income, notwithstanding the impact of the distribution on the company's ability to fund its operations.[34] In the words of the Committee's counsel, Woodside Group's senior management was, in essence, "running a concierge service" for the payment of taxes.

Second, the Committee has established that the Defendants understood and appreciated the benefit conferred by Woodside Group. Given Nilson's representations regarding Woodside Group's dividend practice, shareholders receiving dividends knew they were being paid to enable them to pay their income tax liabilities as shareholders of the corporation. Nilson testified that "[w]ithout the dividend payments paid to Woodside's shareholders, most of them would have had no way to pay the potential taxes attributable to their respective portion of Woodside's taxable income."[35] Nelson agreed, testifying that "[w]ithout the dividend payments paid to me over the years, I, like most of Woodside's shareholders, would have had no way to pay the potential taxes attributable to my portion of Woodside's taxable income."[36] Cosgrave testified that there was never a time when Woodside Group did not make a dividend distribution in an amount sufficient to pay taxes related to her interest in the corporation.[37] Nilson, Arave, Nelson, Haywood, Pugsley, and Cosgrave testified that they have received, or expect to receive, refunds of federal and state taxes paid with such dividends in 2006 and 2007 in the aggregate amount of $85,351,960 due to the loss triggered by the Corporate Restructuring on or about July 25, 2008. Rightly or wrongly, Woodside Group's financial reporting manager, Scott Allen, understood the refunds to be "essentially the return of money that were paid out of the company to make those tax payments."[38]

30. *See* footnote 12 *supra.*

31. Ex. 121.

32. Ex. 193, at 45:23–46:4.

33. Ex. 194, at 257:22–258:8.

34. Ex. 197, at 316:6–317:25.

35. Nilson Decl. at 11:21–22, Nov. 16, 2009.

36. Nelson Decl. at 4:14–16, Nov. 16, 2009.

37. Ex. 196, at 14:5–9

38. Q. And is it your understanding that the refunds that are recoverable and have been recovered by these individuals and by these trusts are essentially the return of money that were paid out of the company to make those tax payments?

MR. CASTANARES: Objection. Assumes facts not in evidence, is argumentative, and calls for speculation.
A. I would guess so, yes.
Q. Well, I mean—
A. I mean, based on what's out there. I don't know what their personal tax situa-

Because there is no evidence of a written contract, the Committee's unjust enrichment theory hinges on whether retention of the benefit would be inequitable. In this regard, the *Forman Enterprises* case is clearly distinguishable. There is nothing in *Forman Enterprises* to indicate that the corporation failed either to review its debt instruments to determine if dividends were permissible or to perform a meaningful analysis of its net profits, cash flow, and the actual tax exposure of its shareholders before declaring a dividend to assist shareholders in paying taxes on income attributable to their interests in the corporation. Secondly and more to the point, there was no evidence in *Forman Enterprises* showing that the action taken by the debtor's management and its shareholders "was 'done on the sly' or that it was an artifice devised by defendants to benefit themselves and to deprive debtor's creditors should debtor become insolvent." *Forman Enterprises*, 281 B.R. at 609.

In this case, senior management invoked the jurisdiction of this court over two of Woodside Group's Restricted Subsidiaries, AMR 107 and Portofino, after Woodside Group's admitted default under the Credit Agreement and Noteholder Debt and during protracted negotiations with it largest creditors, the Bank Group and Noteholder Group, concerning a global restructuring of its debt to the parties. While those negotiations were ongoing and the *AMR 107* and *Portofino* bankruptcy cases were pending, senior management, which held over 90% of Woodside Group's outstanding stock, hatched a scheme in May 2008, with the able assistance of Ernst & Young and Parr Waddoups, to strip the tax basis of Woodside Group's assets, trigger a $500 million tax loss, and generate $110 million in tax refunds solely for the benefit of the shareholders. Senior management used Woodside Group's funds to devise and implement the scheme that triggered the tax refunds. Senior management sought to consummate the scheme while intentionally keeping it a secret from Woodside Group's largest creditors, the court in *AMR 107* and *Portofino*, and its own restructuring professionals, A & M and Pachulski, Stang. They did so to give them leverage in the ongoing negotiations with the Bank Group and Noteholder Group, and to place the tax refunds out of the creditors' reach. Senior management intentionally kept the Bank Group, Noteholder Group, and the court in the dark as they bought time to consummate the reorganization while ostensibly negotiating in good faith to restructure Woodside Group's indebtedness. Senior management engineered the tax recognition for their personal benefit, electing to risk the future of Woodside Group and its 494 employees who were depending on a successful financial restructuring of the company. Facts such as these also do not exist in the *Forman Enterprises* case.

Nilson, Nelson, and Arave each testified that, in making the decision to declare a dividend, they "always considered Woodside's overall financial situation" and relied "on the audited financial statements and our own knowledge of the company's performance."[39] Nilson and Arave added that Woodside employed qualified employees "to analyze and make recommendations on dividend declarations."[40] However, there is little evidence to suggest that Woodside Group performed a meaningful

---

tions are, so I—you know, I can't testify as to each and every one. But I would have to guess due to the nature of the size that the bulk of it, yes, would be.
Ex. 193, at 141:8–22.

**39.** Nilson Decl. at 7:5–7, Nov. 16, 2009; Nelson Decl. at 6:12–14, Nov. 16, 2009; Arave Decl. at 6:14–16, Nov. 16, 2009.

**40.** Nilson Decl. at 7:7–8, Nov. 16, 2009; Arave Decl. at 6:16–17, Nov. 16, 2009.

review of whether a dividend distributed by the company was permissible under its debt instruments, represented an actual return on investment, or would stress the cash flow of the company. Woodside Group stipulated that it was in default under the Credit Agreement on October 24, 2007, but the events of default occurred as early as December 2006. It is undisputed that the existing defaults under the Credit Agreement created corresponding defaults under Woodside Group's obligations to the Noteholder Group. Whether or not § 5.5.3 of the Credit Agreement authorized up to 75% of profits to be distributed to shareholders, the payment of dividends to the Subordinated Lenders was permitted only if no default existed under the Credit Agreement.

Arave testified that dividend distributions by Woodside Group were not considered at a formal meetings of the board of directors nor did he prepare an analysis for presentation to the board in conjunction with a proposed distribution.[41] Arave further testified that he had no formal training regarding the preparation of a distribution analysis for a company.[42] Although the corporation maintained minutes of meetings at which Woodside Group's directors ostensibly met to consider the merits of a dividend, Arave testified that dividends were declared on a "nonformal basis."[43] To the extent the distribution exceeded the amount actually needed to pay federal and state income taxes attributable to their ownership interest in Woodside Group, shareholders who resided in states with either lower tax rates or no state taxes, such as Nilson and Arave, simply pocketed the difference. Woodside Group's practice to distribute to shareholders 44.3% of its net profits as dividends to enable shareholders pay taxes attributable to their respective interests in the corporation continued through May 9, 2008, notwithstanding the resulting cash stress on the corporation.

Even assuming the dividends by Woodside Group in 2006 and 2007 were entirely legitimate at the time of distribution, the shareholders had no expectation of getting any of the money back after the payment of taxes.[44] It was the Corporate Restruc-

---

**41.** Ex. 194, at 235:14–236:12.

**42.** *Id.* at 237:14–19.

**43.** Q. Well, there wasn't a board of director meeting called for the purpose of determining whether to declare dividends—
A. Not—
Q.—ever. Right?
A. Not that I can recall.
Q. Okay. They were instead done on a nonformal basis—
A. Yes.
Q.—those decisions? And there were not contemporaneous meeting minutes prepared in connection with those informal meetings?
A. I usually didn't prepare those minutes so I can't say.
Q. Well, who did?
A. Wayne Farnsworth prepared the minutes.
Q. Was he—did he even attend these informal meetings?
A. Sometimes.
Q. At times when he didn't, who prepared the minutes.
A. Wayne did.
Q. You just told him what was decided?
A. Yes.
Q. Okay. The board of director—how long after these meetings took place were board of director meeting minutes prepared?
A. I don't know.
*Id.* at 58:11–59:13.

**44.** Woodside Group's largest shareholder certainly had no such expectation. In his deposition on October 19, 2009, Nilson testified:
Q. Let me just ask it this way. Prior to January 2008 you had no expectation that you were going to receive the vast sums of money through tax refunds that you have now received in connection with any sort of conversion.
A. No.
Q. Is that correct?
A That's correct.
Ex. 199, at 93:3–10.

turing plan, undertaken by senior management on the stated belief that a write down of the value of Woodside Group's assets would not adversely affect the economic or pecuniary interests of Woodside Group's creditors, that triggered the return of a substantial portion of those funds.[45]

If senior management truly believed that the Corporate Restructuring plan concocted in May 2008 was a proper exercise of their fiduciary responsibilities and in the best interests of Woodside Group, why do it on the sly?[46] Why not disclose facts concerning the restructuring of Woodside Group and its related entities to the Bank Group, the Noteholder Group, or even Woodside Group's own restructuring professionals—A & M and Pachulski, Stang.[47] Why conceal facts concerning the restructuring of AMR 107 and Portofino from the court after filing voluntary petitions with this court seven months earlier for the stated purpose of reorganizing those entities under chapter 11. Why not undertake the Corporate Restructuring in the light of day rather than by stealth under a veil of secrecy? The fact is, Woodside Group had defaulted on its obligations to the two creditor groups that held the strings to its survival—the Bank Group and Noteholder Group. Despite nearly nine months of negotiations since execution of the initial Forbearance Agreement, Woodside Group had yet to resolve existing and ongoing events of default. Notwithstanding the negative impact on cash flow, senior management elected to use the company's precious cash to fund

**45.** "I understood there was no harm to creditors from the Corporate Restructuring. I understood that under Generally Accepted Accounting Principles the restructuring of Woodside Group, Inc. would be treated as a conversion. I also understood that the tax effect of the Corporate Restructuring is that Woodside Group, Inc. as a corporation will be deemed to have sold its assets, and then recontributed the assets to the newly converted Woodside Group, a limited liability company. The 'E & Y Presentation' stated, and I understood, that '[t]he basis of the assets contributed to the partnership could not be lower than the greater of FMV of the assets or the debt.' As of June 30, 2008, the fair market value of Woodside Group's assets was estimated to be approximately $1.3 billion, and the outstanding debt of [Woodside Group] was estimated to be $1.28 billion, a number that includes approximately $330 million of intercompany debt owed to PHI. Because the tax basis of the assets cannot be written down below the amount of debt, I concluded and believe that the transaction could not have an adverse impact on creditors." Ex. 159, at 6:4–15.

**46.** Nilson testified that Woodside Group had been considering a restructuring for approximately two or three years. Ex. 199, at 88:23–89:20. Arave testified that:

Based on ongoing discussions with potential sources of investment capital, [Wood-side Group] had been aware since January 2008 that the companies would be required to convert from subchapter S corporations and qualified subchapter S corporations to more flexible entity structures in order to accommodate any form of outside investment and to avoid adverse tax consequences. In addition, the Noteholder Group's own proposal would have required the conversion to happen in order for the company to retain its pass-through status. Thus, management understood that conversion of S corporations to limited liability companies or limited partnerships would be economically advantageous for investors and creditors. Ernst & Young ("E & Y"), the company's tax advisors, also had been advising the company for several years to consider converting to a limited liability company to deal with shareholder estate issues as well as to provide ease of administration. Historically, however, this was inadvisable due to phantom income issues. Ex. 159, at 5:7–17.

**47.** Particularly given the fact that Arave admits "[t]he tax incentives for the Corporate Restructuring were substantial, and were well known to the Noteholder Group and Bank Group." Ex. 159, at 4:10–11. And the fact that Nilson, Nelson, and Arave discussed using the tax refunds in the context of a bankruptcy proceeding. Ex. 192, at 66:6–69:20.

dividends to its shareholders through May 2008 and to pay undisclosed professionals to engineer a restructuring designed to place tax refunds directly attributable to such dividends out of the reach of creditors. For these reasons, retention of the benefit in this case would be inequitable.

### B. *Likelihood of Irreparable Harm Absent Preliminary Relief*

"Preliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is *likely* in the absence of an injunction.'" *Johnson v. Couturier*, 572 F.3d 1067, 1081 (9th Cir.2009) (quoting *Winter*, 129 S.Ct. at 375). Arave admitted as early as October 2008 that "the tax refunds to be generated as a result of the Corporate Restructuring may be the principal source of *any* recoveries from the shareholders."[48]

By declarations filed on October 2, 2009, Nilson, Arave, Pugsley, Haywood, and Cosgrave each testified that the state and federal tax refunds received, or to be received, attributable to Woodside Group's 2006 and 2007 NOLs generated by the Corporate Restructuring have been, or will be, deposited into an interest-bearing account, commingled with other funds, and invested conservatively.[49] Each further testified that they intend to make "only ordinary course expenditures of those funds," and that they will "not abscond with [the] funds, secrete them, or take any other action designed to put them beyond the reach of creditors."[50] However, Defendants, individually and collectively, will not agree to an order prohibiting the use or disposition of the funds in the account attributable to the tax refunds pending further order of the court. The Committee fears that, absent a preliminary injunction sequestering a substantial portion of the tax refunds, the money will be converted from liquid accounts to illiquid investments in other companies or property during the pendency of the lawsuit effectively placing the funds out of the immediate reach of the estate. The unwinding of these illiquid investments, reasons the Committee, creates irreparable harm.

Defendants assert that the Committee failed to produce any credible evidence of genuine irreparable harm or that it is likely to occur absent the issuance of a preliminary injunction, as required by *Winter*. Defendants attack the Committee's argument as circular, *i.e.*, the fact that the Defendants will not stipulate to the relief sought by the Committee in seeking a preliminary injunction does not, in and of itself, establish either irreparable harm or that it is likely. Defendants also accuse the Committee of attempting to balance the equities before establishing a genuine threat of irreparable harm. The fact is, according to Defendants, the tax refunds are all the Defendants have left of their investments in Woodside Group with which to begin a fresh start and they have no reason to squander the money during the pendency of the litigation.

Based on the evidence presented, the court believes that the Committee's fears

---

**48.** Ex. 159, at 7:1–2 (emphasis added).

**49.** Ex. 38, at 35:11–15; Ex. 39, at 30:22–25; Ex. 41, at 40:21–24; Ex. 40, at 37:21–24; Ex. 42, at 43:21–23.

**50.** Ex. 38, at 35:15–19; Ex. 39, at 30:25–28; Ex. 41, at 40:24–26; Ex. 40, at 37:24–26; Ex. 42, at 43:24–25. Nelson also testified that he had deposited the funds "into either one of our checking accounts or brokerage accounts," that the "funds are commingled with other funds of ours in the same account, and are invested conservatively," and that he has "no intention of absconding with those funds, secreting them, or taking any other action designed to put them beyond the reach of creditors." Nelson Decl. at 9:5–11, Nov. 16, 2009.

are well-founded. At the hearing, Nilson and Arave testified that they have *no current plans* to invest in a new business venture. But Nilson and Arave were, in fact, exploring new investment opportunities at the time they filed their declarations with the court on October 2, 2009.

51. MR. CASTANARES: After consultation between Mr. Nilson and myself at which Mr. Arave was not present, it is our position that the confidentiality agreement does not prohibit Mr. Arave from answering the pending question and he will do so.

A. Leucadia International has interested—has expressed an interest in teaming up and purchasing some of the assets that Zions Bank has.

Q. Teaming up with whom?

A. Some of the existing management with Woodside that's being—were expected to be let go shortly after the bankruptcy.

Q. Who within the management team are you speaking of?

A. Myself, Ezra Nilson, Seth Ure, David Crockett, Nate Pugsley.

Q. Anyone else?

A. None that I know of.

Q. And when did these discussions with Leucadia begin?

A. I got involved probably a month ago.

Q. Has Zions Bank indicated how much these assets are going to cost—

A. No.

Q.—to purchase?

A. No.

Ex. 194, at 331:7–332:7

Q. Have you done any analysis as to the value of that land?

A. I think so.

Q. And where are those documents?

A. They're at my home.

Q. And who did the valuation of that land?

A. I think Ezra and Nate Pugsley.

*Id.* at 332:22–333:3.

Q. How much time have you and Mr. Nilson and the rest of this management team spent assessing these issues?

A. Not much.

Q. Well, enough to develop some draft of a business plan and to project out costs or the value of certain properties. True?

A. Yeah, on a pretty high level.

Q. How many meetings has this team had in connection with this potential opportunity?

A. I think I met with Nate twice and Ezra once.

Less than 15 days later, Arave testified at his deposition that Nilson, Arave, Pugsley, Ure, and Crockett were in discussions with Leucadia International to purchase assets from Zions which conceivably would have required a cash investment of up to $50 million.[51] The following day, Nilson con-

*Id.* at 334:23–335:8.

Q. What sort of investment do you think it will take to purchase these—this property?

A. Oh, you know, if you bought the entire pool of assets at Zions, if you decided to go for that play, it would be—the land would—you could maybe get it from Zions for 50 million. Then you would have to develop it and build houses and so . . .

Q. What portion of that investment would be finance versus equity in that deal?

A. There's not much financing out there right now.

Q. So you would just put up whatever cash you had to develop that property?

A. You're going to have to figure out some way because banks aren't in the business anymore.

Q. And you have not approached any private equity group in that regard?

A. No.

Q. Or any other source of capital in that regard?

A. No.

Q. What is your timeline for trying to implement this potential opportunity?

A. Well, I think it could happen fairly quickly. I think Zions would like to get rid of the assets. I think we would like—I mean, we obviously need to finish up with our responsibilities with Woodside. And, you know, once we finish up those responsibilities for Woodside, we'd like to get started fairly quickly, either with that or something else.

Q. When you say "fairly quickly," how soon do you think you'd be able to purchase these assets?

A. Boy, dealing with Zions I don't know. But you would—you would think where we already know the assets and don't have to do a lot of due diligence that would be an advantage to us and we could probably get going within 30 to 45 days, you would hope, but it could take longer.

Q. Have you disclosed any of these efforts to the bankruptcy court in California?

A. No.

*Id.* at 336:10–338:1.

firmed the discussions with Leucadia International during his deposition, testifying that he had also been in discussions with Och–Ziff, W.L. Ross, and Oaktree about entering the home building business after confirmation.[52] Having weighed the evidence and assessed the credibility of the witnesses, the court finds there is a likelihood of irreparable harm in the absence of a preliminary injunction against Nilson, Arave, Pugsley, Crockett, and Ure. While there is a distinct possibility that Nelson, Haywood, Cosgrave, and the remaining Defendants might spend the tax refunds sought to be sequestered or invest in illiquid assets pending a trial on the merits, the Committee has failed to demonstrate as to such Defendants that irreparable harm is likely absent a preliminary injunction.

## C. *The Balance of Hardships*

 A preliminary injunction can be narrowly tailored to target and prohibit a specific act pending the outcome of the litigation. *See, e.g., High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 641 (9th Cir.2004) (recognizing the court's broad latitude in crafting equitable relief); *U.S. v. Odessa Union Warehouse Co-op*, 833 F.2d 172, 175 (9th Cir.1987) ("The essence of equity jurisdiction is the power of the court to fashion a remedy depending upon the necessities of the particular case."). In determining whether to grant such an injunction, the court "must assess the harms pertaining to injunctive relief in the context of that narrow injunction." *Sierra Forest Legacy*, 577 F.3d at 1022.

The Committee believes that an order impounding funds attributable to the tax refunds is necessary to preserve the *status quo* pending a trial on the merits. The Defendants argue that such an order would dramatically change the *status quo*.[53] The Committee seeks to impound tax refunds generated by a Corporate Restructuring that was devised by senior management, undertaken in secret, timed to provide leverage in ongoing negotiations

---

**52.** Ex. 199, at 31:25–32:11.

**53.** In closing argument on behalf of the Nilson Defendants, Mr. Castanares attacked the relief sought by the Committee as transforming, rather than preserving, the *status quo*, stating:

What all of this is about isn't what its going to come down to when the court enters judgment for one party or another. Because I don't believe and I have never believed that the Plaintiff has any real case on the merits, even on this new theory. And I think the abandonment of all the theories they started on speaks volumes. I don't think this case is about what is finally going to happen.

I think this case is about what we're here about today—it's about whether the money is going to get frozen. Because I think that everybody in this courtroom knows what a dramatic change in the *status quo* that will be. This case is about freezing the money. And the dramatic change in the *status quo* is what I want to talk about. Plaintiff will

get to take something away from the Defendants that they have now....

If this money is impounded and [Nilson] wants to use any part of it, he must come to court and seek leave of the very people who have launched this litigation against him. And all this other litigation. And what can he reasonably expect that that will amount to? He expects that he will have to litigate anything he proposes, and he expects this situation to go on for a long time probably measured in years. And he expects that to occur in a context where there are no clear standards for what he will be allowed or refused. Everything he wants will be yet another piece of litigation. And everybody in this courtroom knows he is exactly right. And he observes that these creditors were told a year ago by the examiner they would have to prove insolvency and they haven't even gotten around to hiring the expert yet. He anticipates that it will be years before he will get this most fundamental of property rights in property that is rightly his. And everybody in the courtroom knows that that is true.

with the Bank Group and Noteholder Group, and calculated to place the tax refunds out of the creditors' reach. The Committee has alleged causes of action on behalf of the estate based upon or arising out of senior management's Corporate Restructuring plan, including a claim of unjust enrichment. There is a direct link between the Committee's claim and the tax refunds sought to be frozen. Under these facts, an order freezing the funds is permissible and necessary to maintain the *status quo*. *See Focus Media*, 387 F.3d at 1085.

The tax refunds would be deposited, or remain on deposit, in an investment account or other interest-bearing account or accounts selected and maintained by each of the Defendants, but the Defendant's use or disposition of funds in the account attributable to the tax refunds would be prohibited pending further order of the court. There is no evidence that Nilson, Arave, Pugsley, Crockett, or Ure need the tax refunds for ordinary and necessary living expenses. The Committee's request is narrowly tailored to target and preserve the tax refunds pending a trial on the merits, but permits access to the funds by Nilson, Arave, Pugsley, Crockett, or Ure for extraordinary or unforeseeable expenses. Nilson, Arave, and Pugsley each concluded that they would be "severely damaged" if the court were to impound the funds, but only Nilson and Arave testified as to facts forming the basis for his conclusion.[54] Considering the harm to both the Committee and these Defendants, and the narrow nature of the relief sought by the Committee, the court finds that the balance of equities tips in favor of the Committee.[55]

**54.** Nilson testified that an order sequestering the tax refunds "will not only inhibit my ability to start anew on a financial level, but it will undoubtedly be seen by potential partners, investors, financiers, and almost everyone as a judgment that I have done something dishonest, that I threaten to do something dishonest, and that I am not to be trusted." Ex. 38, at 5:9–12. Arave stated that an order impounding the funds would "inhibit [his] ability to start anew on a financial level" and impact his campaign for mayor of North Salt Lake because it would "undoubtedly be seen by [his] neighbors and supporters as judgment that [he has] done something dishonest, that [he] threatened to do something dishonest, and that [he is] not to be trusted." Ex. 39, at 31:9–11.

**55.** The Nilson Defendants also allege that the Committee's failed to take prompt action to pursue the tax refunds after dismissal of the complaint originally filed by JPMorgan Chase in Adversary No. 6:08–ap–01359–PC, and that "[t]his unexplained and prejudicial delay should also be considered in the 'balancing of equities' element." Defendants' Memorandum in Opposition to Motion for Preliminary Injunction, at 6:3–4. The Nilson Defendants' only evidence on this point is the testimony of Nilson and Nelson. Nilson testified that "had the Creditors' Committee timely brought an action when it obtained standing to do so, these issues could have been resolved on fair notice without the kind of rush or emergency that the Creditors' Committee has manufactured by its tactics." Nelson Declaration at 23:9–11, Nov. 16, 2009. Nelson testified in similar fashion, stating that "if the Creditors' Committee had brought this action earlier, the merits almost certainly could have been resolved by this time, and I would not be in a situation where my funds get tied up on some 'emergency' resulting only from the delay, not to mention having to bear the burden of an entirely unnecessary preliminary injunction procedure." Nelson Declaration at 9:23–26, Nov. 16, 2009. The court notes that the stipulation under the terms of which the Committee was given authority to pursue causes of action on behalf of the estate was entered on February 13, 2009. Nilson and Arave filed their 2008 federal income tax returns on April 30, 2009, and May 13, 2009, respectively, claiming their proportionate share of Woodside Group's 2006 and 2007 NOLs. The Committee did not learn that Nilson or Arave had received the tax refunds until sometime later. The complaint initiating this adversary proceeding was filed on September 17, 2009. Given the circumstances and paucity of evidence regarding actual prejudice, the court cannot find that the 7–month delay tips the balance of equities in favor of the Defendants.

### D. *Public Interest*

■■■■■ "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.'" *Winter,* 129 S.Ct. at 376–377 (quoting *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982)). "The public interest analysis for the issuance of a preliminary injunction requires [the Court] to consider whether there exists some critical public interest that would be injured by the granting of preliminary relief." *Indep. Living,* 572 F.3d at 659.

Here, the court finds that the public interest factor is neutral. To the extent that the public interest has been considered in the bankruptcy context, courts have identified the achievement of reorganization as a public interest worthy of protection. *In re Fullmer,* 323 B.R. 287, 305 (Bankr.D.Nev.2005).

### E. *Security*

■■■■ Rule 65(c) states that "[the] court may issue a preliminary injunction or temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained. The United States, its officers, and its agencies are not required to give security." F.R.Civ.P. 65(c). Rule 65 "applies in adversary proceedings, except that a temporary restraining order or preliminary injunction may be issued on application of a *debtor, trustee, or debtor in possession* without compliance with Rule 65(c)." FRBP 7065 (emphasis added).

The Committee argues that "[s]ince [it] was appointed by the United States Trus-

tee, a division of the United States Department of Justice, and because this Motion is brought pursuant to, among other things, the Committee's powers under Section 1103(c) of the Bankruptcy Code and the Court's authorization to prosecute matters beneficial to the general creditor body under the Authorization Motion, the Committee is excepted from the security requirement of Bankruptcy Rule 7065(c)." [56] The Nilson Defendants disagree, asserting that neither the language of Rule 7065 nor the court's order entered on February 13, 2009, authorizing the Committee, on behalf of Woodside Group, "to investigate, prosecute and, subject to approval of this Court, settle the Estate Causes of Action," [57] exempt the Committee from tendering a bond in conjunction with the relief sought.

Rule 7065 excepts from Rule 65(a)'s security requirement only a "debtor, trustee, or debtor in possession." Although it may have standing to pursue on behalf of the estate the causes of action set forth in its complaint, the Committee is not a "debtor, trustee, or debtor in possession." Nor does the fact that the Committee was formed by the United States trustee "pursuant to § 1102(a)(1) tuck the Committee within the scope of Rule 65(a)'s exemption for [t]he United States, its officers, and its agencies." Section 1103(c), which enumerates the powers and duties of the Committee, does not except a creditors' committee from either Rule 65(c) or Rule 7065, nor did the court's order entered on February 13, 2009, purport to do so, expressly or impliedly. The Committee has not alleged nor established that it does not have the financial resources to post a bond. *See Cal. v. Tahoe Regional Planning Agency,* 766 F.2d 1319, 1325 (9th Cir.) ("The court

---

**56.** Motion for Order to Show Cause Why a Preliminary Injunction Should Not Issue and Supporting Memorandum of Points and Authorities, at 25:5–11.

**57.** *See* footnote # 18, *supra.*

has discretion to dispense with the security requirement or request mere nominal security where requiring security would effectively deny access to judicial review."), *amended,* 775 F.2d 998 (9th Cir.1985). Moreover, the Committee has not cited any case, nor has the court found one, holding that a creditors' committee is relieved from the requirement of an undertaking by the terms of either Rule 65(c) or Rule 7065.

 The purpose of the bond is to guarantee payment of damages and costs incurred by a party who is wrongfully enjoined or restrained. *Wash. Capitols Basketball Club, Inc. v. Barry,* 304 F.Supp. 1193, 1203 (N.D.Cal.), *aff'd,* 419 F.2d 472 (9th Cir.1969). Damages for wrongful injunction, both against the plaintiff and surety, are limited by the amount of the bond. *See Nintendo of Am. v. Lewis Galoob Toys, Inc.,* 16 F.3d 1032, 1036 (9th Cir.1994) (holding that "there is a rebuttable presumption that a wrongfully enjoined party is entitled to have the bond executed and recover provable damages up to the amount of the bond"). Attorneys fees are not recoverable as damages on the bond. *Bass v. First Pac. Networks, Inc.,* 219 F.3d 1052, 1054 (9th Cir.2000). The court has considerable discretion in setting the amount of the bond. *Wash. Capitols,* 304 F.Supp. at 1203. The Nilson Defendants "suggest a bond in the full amount sequestered."[58] The Committee counters that, if it must provide security, a $20,000 bond is adequate. The Committee has not presented evidence that it would be able to satisfy any judgment for damages that might result from a wrongful issuance of an injunction. Given the amount of tax refunds to be sequestered, the fact that the tax refunds will remain in the possession of those Defendants enjoined, that such Defendants will be permitted to place the funds in liquid investments as they see fit, and that the funds will be accruing interest or dividends pending a trial on the merits, the court finds that a bond of $100,000 is proper pursuant to Rule 65(c).[59]

## III. CONCLUSION

For the reasons stated above, the court concludes that the Committee has made a clear showing that it is likely to succeed on the merits of its unjust enrichment claim and is likely to suffer irreparable harm in the absence of a preliminary injunction against Defendants, Nilson, Arave, Pugsley, Crockett, and Ure. The Committee has further established that the balance of equities tips in its favor, and that injunctive relief is not contrary to the public interest. Because the evidence presented does not support a finding that irreparable harm is likely absent injunctive relief as to the remaining Defendants, the Committee's motion is denied without prejudice as to those parties.

The Committee's counsel is directed to lodge a proposed order granting the Committee's motion for preliminary injunction consistent with this opinion.

---

**58.** Defendants' Memorandum in Opposition to Motion for Preliminary Injunction, at 28:11–12.

**59.** The amount of security may be increased or decreased by motion, after notice and a hearing, for cause shown. *See Wash. Capitols,* 304 F.Supp. at 1203. *See also* 3 Moore's Manual: Federal Practice and Procedure § 10A.20[8][a], at 10A–20 (2009) ("A party may move the court to increase or decrease the amount of security so long as the restraint or injunction is in effect.").